Linda **KEESLING**, Harold Lephart and Priscilla Lephart, Hagar Anderson, James Bridges, Earl and Evelyn Haibe, Escar App, Mabel McGuffey, Ruth Amick, and Dora Butrum, Appellants–Plaintiffs,

v.

David G. **WINSTEAD** and James Leone, Appellees– Defendants.

No. 18A02–0601–CV–73.

Court of Appeals of Indiana.

Dec. 21, 2006.

---

24. Consequently, we deny as moot Bucholtz's motion to strike portions of Appellants' brief.

Richard N. Bell, Arend J. Abel, Kelley J. Johnson, Cohen & Malad, LLP, Indianapolis, IN, Attorneys for Appellant.

Lester H. Cohen, Brian M. Pierce, DeFur Voran LLP, Muncie, IN, Attorneys for Appellee, David G. Winstead.

James R. Leone, New Smyrna Beach, FL, Appellee pro se.

## OPINION

CRONE, Judge.

### Case Summary

Plaintiffs Linda Keesling, Harold and Priscilla Lephart, Hagar Anderson, James

Bridges, Earl and Evelyn Haibe, Escar App, Mabel McGuffey, Ruth Amick, and Dora Butrum (collectively, "Appellants") appeal the trial court's orders granting final summary judgment in favor of defendants David G. Winstead and James Leone on the issue of personal jurisdiction. We affirm.

## Issues

We restate Appellants' issues as follows:

I.  Whether the trial court erred in granting summary judgment in favor of Winstead on the issue of personal jurisdiction; and

II. Whether the trial court erred in granting summary judgment in favor of Leone on the issue of personal jurisdiction.

## Facts and Procedural History[1]

A more detailed recitation of the facts giving rise to this appeal may be found in a companion case we decide today, *Keesling v. Beegle*, No. 18A04–0501–CV–10, 858 N.E.2d 980 (Ind.Ct.App. Dec. 21, 2006). For purposes of this opinion, we note that in 1986, Paul Rubera founded Alpha Telcom, Inc. ("Alpha"), an Oregon company that sold, installed, and maintained telephones and business systems. *S.E.C. v. Alpha Telcom, Inc.*, 187 F.Supp.2d 1250, 1254 (D.Or.2002). In 1997, Charles

Tummino approached Rubera and suggested selling "payphones to individuals who would then enter into a service agreement with Alpha to install, service, and maintain the payphones." *Id.* Rubera consulted Alpha's attorney, Dan Lacy, who issued an opinion letter concluding that the arrangement would not constitute the sale of a security. Lacy sought an opinion from Florida attorney James Leone, who reached the same conclusion.

*Id.,* at 982. Leone understood that his legal opinion "[w]as to be used to give assurance to Alpha Telcom that they were engaged in a legal business. It was issued to Paul Rubera, he specifically wanted his butt covered, you know, for criminal purposes as well as civil purposes. . . ." Appellants' App. at 456 (Leone deposition). Leone's opinion addressed whether payphone sales constituted the sale of a security under the laws of Florida, Oregon, and the Eleventh and Ninth Circuits. *Id.* at 478.

In October 1998, American Telecommunications Company, Inc. ("ATC"), was created to market and sell the payphone program to investors.[2] Leone allowed his opinion letter to be included in the manual provided to payphone program sales representatives. At the request of Ross Ram-

---

1.  In their brief, Appellants include numerous incidental facts that have no bearing on the issue of personal jurisdiction. We remind Appellants' counsel that an appellant's statement of facts must "describe the facts relevant to the issues presented for review[.]" Ind. Appellate Rule 46(A)(6).

2.  According to Appellants' fourth amended complaint, ATC was a wholly owned subsidiary of Alpha until July 2000, when its shares were transferred to Rubera, who later sold them. Appellants' App. at 113. Appellants allege that the payphone program was a pyramid or Ponzi scheme, but the district court in *Alpha Telcom* attributed Alpha's financial

woes to "bad advice, poor management," the acquisition of worthless or nonexistent payphone sites by one of Ross Rambach and Mark Kennison's enterprises, and "sudden artificial buyback demand created by [Strategic Partnership Alliance, LLC ('SPA'), another Rambach and Kennison enterprise], and the accompanying sudden artificial demand for new phones." 187 F.Supp.2d at 1261, 1262. Thus, it would appear that the fact that "payments made by Alpha to existing investors came from the sale of phones to new investors" was a matter of default, rather than design, as Appellants contend. *Id.* at 1257.

bach,[3] Leone also sent the opinion letter to individual sales representatives "who said I want to see it from an attorney." Appellants' App. at 465 (Leone's deposition). According to affidavits filed by Appellants in response to Leone's summary judgment motion, sales representatives showed Leone's opinion to several Appellants, who relied on the opinion in making their decision to invest in the payphone program between September 1999 and April 2001.[4] *Id.* at 497, 500, 503, 506, 509, 512 (affidavits of Earl Haibe, James Bridges, Mabel McGuffey, Ruth Amick, Escar App, and Linda Keesling).[5]

At all relevant times, Winstead was either a vice president or general manager of Alpha and a resident of either Oregon, Utah, or Colorado. According to Winstead, "[t]he sale of the payphone program was separate and distinct from the installation, service, and maintenance of equipment[,]" for which he was responsible. Appellants' App. at 412 (supplemental affidavit). Payphone program sales representatives gave customers several documents to sign, including an Alpha telephone services agreement and an ATC telephone equipment purchase agreement. The telephone services agreement had several exhibits, including a telephone equipment list, a buyback election form, and monthly fees and disclosure forms. After the customer signed the documents, the sales representative mailed them to the home office in Oregon. Alpha then sent the customer a copy of the telephone services agreement bearing Winstead's stamped signature. ATC sent the customer a payphone purchase confirmation bearing Winstead's stamped signature as general manager.[6]

In 2000, as an employee of Alpha, Winstead traveled to Indiana to visit the facilities of Opticom, Inc., and to discuss the possible use of Opticom as an operator service provider for Alpha's telephone operations. In May 2001, the Indiana secretary of state issued a cease and desist order against Alpha, ATC, Rubera, Winstead, and others, instructing them to re-

---

**3.** Rambach was co-owner of SPA, which hired, trained, and supervised the payphone program sales representatives.

**4.** The payphones sold to one of the Appellants, Ruth Amick, were installed in Bellevue, Washington. Appellants' App. at 395. There is no indication that any of the payphones sold to Appellants were installed in Indiana.

**5.** Leone alleges that these affidavits are perjurious and are contradicted by Appellants' deposition testimony. Leone's Br. at 20. Appellants' reply to this allegation is troubling:

Leone's repeated claims that the Plaintiffs' affidavits were "perjurious" ignore the summary judgment context in which the personal jurisdiction issue was decided and, more importantly, are incorrect. Plaintiff Keesling testified that she recalled reading legal opinions concerning the deal, and Plaintiff Bridges testified that Van Deusen had a "Legal Opinion, he had something in his sales brochure said that everything was legal, Van Deusen did." Excerpts from

these two depositions are included in the addendum to this brief.

Appellants' Reply Br. at 15 n. 5. Those depositions were not part of the record on summary judgment, however. We therefore grant Leone's motion to strike as to footnote 5 of Appellants' Reply Brief and Appellants' Addendum and deny the motion in all other respects. Leone's challenge to the veracity of the affidavits is one of the bases for his appeal in *Leone v. Keesling*, No. 18A04–0510–CV–626, 858 N.E.2d 1009 (Ind.Ct.App. Dec. 21, 2006). Because the affidavits are not essential to our resolution of this case, we do not address their veracity in this opinion.

**6.** The confirmation form does not mention Alpha. According to Winstead, "the confirmations were sent as a matter of course by employees under [his] general responsibility, who used a stamp of [his] signature for that purpose. But they were sent as a matter of company policy, not at [his] express initiative." Appellants' App. at 411 (supplemental affidavit).

frain "from conducting business as unregistered broker-dealers" and "from offering and/or selling unregistered securities[.]" *Id.* at 420.

In February 2002, several Appellants filed suit against Winstead and others (not including Alpha, which filed for bankruptcy, or Opticom), alleging violations of the Indiana Securities Act and the Indiana Corrupt Business Influence Act (RICO), as well as theft, conversion, and common law fraud. Winstead moved to dismiss the complaint. Appellants added Leone as a defendant in their first amended complaint in August 2002. Leone unsuccessfully sought removal to federal court and dismissal for lack of personal jurisdiction. In March 2003, Appellants filed a second amended complaint, which Winstead and Leone unsuccessfully sought to dismiss. In December 2003, Appellants filed a third amended complaint, which Winstead answered and Leone unsuccessfully sought to dismiss. In May 2004, Appellants filed a fourth amended complaint, which both Winstead and Leone unsuccessfully sought to dismiss. In May 2005, Appellants, Winstead, and Leone all filed motions for summary judgment addressing the issue of personal jurisdiction.[7] Leone also requested that he be awarded attorney's fees and expenses and that Appellants' counsel be held in contempt. On August 5, 2005, the trial court issued orders granting summary judgment in favor of Winstead and Leone and denying Appellants' summary judgment motion. The trial court also denied Leone's request for fees, expenses, and contempt. Leone filed a motion to correct error as to this ruling, which the

trial court denied.[8] On March 3, 2006, the trial court certified its August 2005 orders as final appealable judgments pursuant to Indiana Trial Rule 56(C).

## Discussion and Decision

### *General Considerations/Standard of Review*

■■■ "Personal jurisdiction is the court's power to bring a person into its adjudicative process and render a valid judgment over a person." *Brockman v. Kravic,* 779 N.E.2d 1250, 1254 (Ind.Ct. App.2002). "The existence of personal jurisdiction over a defendant is a constitutional requirement to rendering a valid judgment, mandated by the Due Process Clause of the Fourteenth Amendment." *Anthem Ins. Cos. v. Tenet Healthcare Corp.,* 730 N.E.2d 1227, 1237 (Ind.2000). "Because Indiana state trial courts are courts of general jurisdiction, jurisdiction is presumed. Therefore, the plaintiff need not allege jurisdiction in its complaint." *Id.* at 1231 (footnote admitted). "[O]nce the party contesting jurisdiction, usually the defendant, challenges the lack of personal jurisdiction, the plaintiff must present evidence to show that there is personal jurisdiction over the defendant. However, the defendant bears the burden of proving the lack of personal jurisdiction by a preponderance of the evidence, unless the lack of jurisdiction is apparent on the face of the complaint." *Id.* "It is within the trial court's sound discretion to decide the jurisdictional facts." *Brockman,* 779 N.E.2d at 1255. "A trial court's findings of jurisdictional facts are generally reviewed for clear error. Once the court has decided

7. Appellants' summary judgment motion also addressed the merits of their claims, which the trial court did not reach based on its finding that it did not have personal jurisdiction over Winstead and Leone.

8. The denial of Leone's request for fees, expenses, and contempt is the subject of his

appeal in *Keesling v. Leone,* No. 18A04–0601–CV–73. Leone also filed a motion to supplement summary judgment record and a supplemental affidavit, which the trial court denied.

those facts, however, whether personal jurisdiction exists is a question of law. We review a trial court's determination of personal jurisdiction de novo." *Id.* (citations omitted).

Here, the trial court resolved the issue of personal jurisdiction via the parties' motions for summary judgment.

On appeal, the standard of review of a summary judgment motion is the same as that used in the trial court: summary judgment is appropriate only where the evidence shows there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Ind.Trial Rule 56(C). All facts and reasonable inferences drawn from those facts are construed in favor of the non-moving party. The review of a summary judgment motion is limited to those materials designated to the trial court. T.R. 56(H). We must carefully review decisions on summary judgment motions to ensure that the parties were not improperly denied their day in court.

■ *Tom–Wat, Inc. v. Fink,* 741 N.E.2d 343, 346 (Ind.2001) (some citations omitted). A trial court's grant of summary judgment is clothed with a presumption of validity, and the appellant bears the burden of demonstrating that the trial court erred. *Cox v. NIPSCO,* 848 N.E.2d 690, 695 (Ind.Ct.App.2006). "Where a trial court enters specific findings and conclusions, they offer insight into the rationale

for the trial court's judgment and facilitate appellate review, but are not binding upon this court." *Id.*

As our supreme court explained in *Anthem,*

> Any discussion of personal jurisdiction in Indiana must first start with Trial Rule 4.4(A), Indiana's equivalent of a "long-arm statute." This trial rule provides a limit on the exercise of jurisdiction over nonresident defendants. There are two types of long-arm statutes: (1) those which direct the court to exercise jurisdiction to the extent allowed by the United States and state constitutions and (2) "enumerated act" statutes, which direct the court to assert jurisdiction over defendants who commit any act listed in the statute in the state.

730 N.E.2d at 1231–32 (footnote omitted). When Appellants filed suit in February 2002, Trial Rule 4.4(A) was strictly an "enumerated act" statute, although this Court had frequently stated that it was intended to extend personal jurisdiction to the limits permitted under the Due Process Clause. *See id.* at 1232 (collecting cases).[9] "Typically, under such a statute, courts must proceed with a two-step analysis. First, the court must determine if the defendant's contacts with the forum state fall under the long-arm statute. Second, if they do, the court must then determine whether the defendant's contacts satisfy federal due process analysis." *Id.* (footnote omitted).[10]

---

**9.** In *Anthem,* our supreme court noted that "[t]he majority of these opinions ... proceed directly to discussion of the limits of federal due process and the accompanying federal and state case law without first determining whether the conduct in question falls under Indiana Trial Rule 4.4(A)." 730 N.E.2d at 1232. "Although the result in many of these cases would likely have been the same, this one-step analysis has the effect of ignoring T.R. 4.4(A)." *Id.* (footnotes omitted).

**10.** Effective January 1, 2003, the following sentence was added to the eight subparagraphs of Trial Rule 4.4(A) enumerating various acts serving as a basis for jurisdiction: "In addition, a court of this state may exercise jurisdiction on any basis not inconsistent with the Constitutions of this state or the United States." In *LinkAmerica Corp. v. Albert,* 857 N.E.2d 961 (Ind., 2006), our supreme court confirmed that this amendment was intended to, and does, reduce analysis of personal jurisdiction to the issue of

Here, the trial court assumed for purposes of summary judgment that it had a basis for personal jurisdiction over Winstead and Leone under Trial Rule 4.4(A). Appellants' App. at 341, 353. We therefore focus on whether Winstead's and Leone's contacts with Indiana satisfy federal due process analysis.[11] We discussed this topic at length in *Brockman*, 779 N.E.2d 1250:

> The modern approach to personal jurisdiction was established in *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), and *Hanson v. Denckla*, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). In *International Shoe*, the United States Supreme Court explained that a person must have certain minimum contacts with the forum such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. The existence of personal jurisdiction depends on the nature and quality of the contacts with the forum, not a mechanical test. In *Hanson*, the Supreme Court added the requirement that the defendant's contacts consist of some action by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws. Only the purposeful acts of the defendant, not the acts of the plaintiff or any third parties, satisfy this requirement.
>
> Thus, there is a two-part test to determine whether personal jurisdiction exists under the Due Process Clause. First, courts must look at the contacts between the defendant and the forum state to determine if they are sufficient to establish that the defendant could reasonably anticipate being haled into court there. If the contacts are sufficient, then the court must evaluate whether the exercise of personal jurisdiction offends traditional notions of fair play and substantial justice by weighing a variety of interests.
>
> Contacts are any acts physically performed in the forum state or acts performed outside the forum state that have an effect within the forum. There are two types of contacts that may be sufficient to establish jurisdiction: (1) the defendant's contacts with the forum state that are unrelated to the basis of the lawsuit, and (2) the defendant's contacts that are related to the subject matter of the lawsuit. Those concepts have come to be known as general and specific personal jurisdiction, respectively.
>
> General personal jurisdiction refers to the ability to be sued for any claim in a state. In order to establish general personal jurisdiction, the court must find continuous and systematic contacts with the forum state such that the defendant could reasonably foresee being haled into court in that state for any matter. General personal jurisdiction may exist if the contacts are substantial, continuous, and systematic. The contacts required for general personal jurisdiction are greater than those needed to establish specific personal jurisdiction.

*Id.*, slip. op. at 967. For the reasons given *infra, LinkAmerica* does not affect our due process analysis.

whether the exercise of personal jurisdiction is consistent with the Federal Due Process Clause. Retention of the enumerated acts found in Rule 4.4(A) serves as a handy checklist of activities that usually support personal jurisdiction but does not serve as a limitation on the exercise of personal jurisdiction by a court of this state.

11. Because we conclude that they do not, we need not address the validity of the trial court's assumption that it had a basis for personal jurisdiction under Trial Rule 4.4(A).

Specific personal jurisdiction is jurisdiction that stems from the defendant's having certain minimum contacts with the forum state so that the court may hear a case whose issues arise from those minimum contacts. Under this theory, the defendant's isolated contacts with a state that are not enough to establish general personal jurisdiction may be sufficient to allow jurisdiction over any incidents related to those contacts. A single contact with a forum state may be enough to establish specific personal jurisdiction if it creates a substantial connection with the forum state and the suit is based on that connection. However, the act must be purposeful, not random or attenuated or the unilateral activity of another party or a third person.

The analysis of the contacts for specific personal jurisdiction is fact-specific and determined on a case-by-case basis. Factors to consider when evaluating the defendant's contacts with the forum state are: (1) whether the claim arises from the defendant's forum contacts; (2) the overall contacts of the defendant or its agent with the forum state; (3) the foreseeability of being haled into court in that state; (4) who initiated the contacts; and (5) whether the defendant expected or encouraged contacts with the state.

Once contacts sufficient to establish personal jurisdiction, be it general or specific, are found, the court must further decide whether asserting personal jurisdiction over the defendant offends traditional notions of fair play and substantial justice. In doing so, we balance a number of factors to determine whether the assertion of jurisdiction is reasonable and fair. They are: (1) the burden on the defendant; (2) the forum State's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several States in furthering fundamental substantive social policies. The fairness inquiry is separate from the contacts question and may be used to defeat jurisdiction even if the defendant has sufficient contacts with the forum state. After the plaintiff establishes that there are minimum contacts, the defendant then carries the burden of proving that asserting jurisdiction is unfair and unreasonable. To determine if the exercise of personal jurisdiction is reasonable in a particular case, we may examine the relationship among the defendant, the forum, and the litigation, the principles of interstate federalism, and the existence of an alternative forum to hear the dispute.

*Id.* at 1255–57 (some citations omitted). We now address the issue of personal jurisdiction with respect to each appellee.

### I. Winstead

■ Both parties agree that we are concerned here with specific personal jurisdiction, in that Winstead's contacts with Indiana are insufficient to establish general personal jurisdiction. The trial court made the following findings in support of its conclusion that Winstead did not have sufficient minimum contacts with Indiana for purposes of specific personal jurisdiction:

(a) does the claim arise from Winstead's contacts with Indiana? No—the telephones were already sold; Winstead's "contacts," such as they were, consisted of form maintenance and service contracts on which someone else stamped his signature and then mailed the contract to the customer. He did not perform these activities personally.

(b) Winstead's overall contacts with Indiana; very limited to none; the contracts noted in the finding above, and one visit to Indiana to visit Opticom, a business Alpha was thinking about hiring to assist with phone maintenance.

(c) whether Winstead expected or encouraged contacts with Indiana; Plaintiffs presented no evidence that Winstead ever initiated or encouraged contact with Indiana.

(d) foreseeability for suit in Indiana; Plaintiffs presented no evidence bearing on foreseeability.

Appellants' App. at 348–49.

Appellants do not specifically challenge these findings, but instead contend that "Winstead is subject to jurisdiction because he is the person who, on behalf of Alpha and ATC, entered into the contracts relating to the payphone program with [Appellants]." Appellants' Br. at 14. In so contending, Appellants rely on *Woodmar Coin Center, Inc. v. Owen*, 447 N.E.2d 618 (Ind.Ct.App.1983), *trans. denied*, in which Owen, a Texas resident, telephoned Woodmar, an Indiana coin dealer, in response to a newspaper ad:

> The parties conducted substantial negotiations during several phone calls, each party initiating some of the calls. They agreed on the price of the coins, the method by which Owen was to inspect the coins, and the manner of payment. When the coins were shipped to Owens's bank for inspection, as agreed, Owen decided the coins were not in as good

condition as represented and sent them back to Woodmar.

*Id.* at 619. Woodmar sued Owen for breach of contract in Indiana. We determined that the trial court erred in concluding that it did not have personal jurisdiction over Owen, who "purposely availed himself of the benefits and responsibilities of doing business in this State by soliciting, negotiating and forming a contract with an Indiana resident." *Id.* at 621.

In this case, however, Winstead did not solicit or negotiate contracts with Appellants, nor did he execute the contracts in Indiana. As such, the fact that the contracts bear Winstead's stamped signature is not as significant as Appellants would have us believe.[12] *Cf. Baseball Card World, Inc. v. Pannette*, 583 N.E.2d 753, 755 (Ind.Ct.App.1991) (affirming dismissal of claim against Pennsylvania defendant for lack of personal jurisdiction where "the parties did not commence their relationship in Indiana; [the defendant] has not personally appeared or resided in Indiana; the contract which forms the basis for the suit was not executed in Indiana; no contract negotiations occurred in Indiana; and [the defendant] does not maintain any offices or other businesses in Indiana."), *trans. denied* (1992).

Appellants also rely on *McGee v. International Life Insurance Co.*, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957), in which the U.S. Supreme Court determined that a California state court had jurisdiction over an Arizona life insurance compa-

12. Appellants argue that "[t]he fact that a party delegates to underlings the authority to sign documents on his behalf does not relieve him of the consequences of signing them." Appellants' Br. at 21. While this may be true for purposes of liability, it is not necessarily dispositive for purposes of personal jurisdiction. Appellants assert that "at least one court has explicitly held that a nonresident officer's stamped signature on a letter sent to the plaintiff was enough to subject him to personal jurisdiction." Appellants' Reply Br. at 3 (citing *Wegerer v. First Commodity Corp. of Boston*, 744 F.2d 719 (10th Cir.1984)). Appellants' assertion is misleading, in that the *Wegerer* court based its holding on three separate contacts with the forum state, one of them being "a form letter bearing [a defendant's] signature stamp mailed to [the plaintiff] in Kansas[.]" 744 F.2d at 727.

ny that mailed a reinsurance certificate to a California insured, who accepted the offer and sent premiums to the company's Texas office. The company had never solicited or done any other insurance business in California. The Supreme Court concluded that it was "sufficient for purposes of due process" that the beneficiary's suit against the company "was based on a contract which had substantial connection with [California]. The contract was delivered in California, the premiums were mailed from there and the insured was a resident of that State when he died." *Id.* at 223, 78 S.Ct. 199 (citations and footnote omitted).

Winstead points out, however, that he did not solicit Appellants' business in Indiana. Moreover, Appellants did not send their money to or receive any money from Winstead personally, but rather his employer, Alpha. Appellants' attempts to blur the distinction between Winstead and Alpha for purposes of personal jurisdiction are unpersuasive and unavailing. *See Calder v. Jones*, 465 U.S. 783, 790, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984) (stating that defendant employees' contacts with

forum state "are not to be judged according to their employer's activities there").

Turning now to the factors we consider in evaluating Winstead's contacts with Indiana, *see Brockman*, 779 N.E.2d at 1257, we first observe that those contacts are only tangentially related to Appellants' claims. As the trial court duly noted, the pay telephones had already been sold by the time Winstead's employees stamped his signature on the contracts and returned them to the customers.[13] Second, Winstead's overall contacts with Indiana were very limited, consisting of his stamped signature on the contracts and his unrelated visit to Opticom.[14] Third, although it is foreseeable that Indiana payphone program customers would sue Winstead because his stamped signature appears on the payphone contracts, the U.S. Supreme Court has stated that " 'foreseeability' alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause." *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).[15] Fourth, with the

---

**13.** In other words, any misrepresentations about the nature of the payphone program had already been made. Therefore, we are unpersuaded by Appellants' cited cases involving defendants who signed documents upon which investors *subsequently* relied in purchasing securities.

**14.** Appellants note that Winstead is mentioned on one page of the payphone program sales manual, which summarizes his work experience and describes him as the person "responsible for the company's day to day operations." Appellants' App. at 429. According to Winstead, he "had nothing to do with the preparation or the distribution of" the sales manual. *Id.* at 411 (supplemental affidavit). We fail to see how the mere inclusion of Winstead's curriculum vitae in the sales manual serves as a basis, either in whole or in part, for establishing specific personal jurisdiction. Appellants also note that Winstead signed a consent decree in Illinois re-

garding the payphone program in January 2000 and was named in a cease and desist order in Indiana in May 2001. While these orders may well "show[ ] how much authority Winstead had in his daily operations of Alpha[,]" as Appellants claim on page 8 of their reply brief, they do not constitute "minimum contacts" with Indiana for purposes of our jurisdictional analysis. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984) ("[U]nilateral activity of another party or a third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a foreign State to justify an assertion of jurisdiction.").

**15.** *See World–Wide Volkswagen*, 444 U.S. at 297, 100 S.Ct. 559, 62 L.Ed.2d 490 ("This is not to say, of course, that foreseeability is wholly irrelevant. But the foreseeability that is critical to due process analysis is not the

possible exception of his visit to Opticom, which is unrelated to Appellants' claims, Winstead did not initiate the contacts with Indiana. Fifth, and last, there is no evidence that Winstead expected or encouraged contacts with Indiana.

Based on the foregoing, we conclude that the designated evidence establishes that Winstead did not purposely avail himself of the privilege of conducting activities within Indiana and could not reasonably have anticipated being haled into court here. *See Brockman,* 779 N.E.2d at 1256. We therefore affirm the trial court's grant of summary judgment in favor of Winstead on the issue of personal jurisdiction.[16]

## II. Leone

▮▮▮▮ The trial court made the following findings in support of its conclusion that Leone did not have sufficient minimum contacts with Indiana for purposes of specific personal jurisdiction:

> mere likelihood that a product will find its way into the forum State. Rather, it is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there."). As we have seen, Winstead's conduct and connection with Indiana were extremely limited.

16. Consequently, we need not determine whether "the exercise of personal jurisdiction offends traditional notions of fair play and substantial justice[.]" *Brockman,* 779 N.E.2d at 1256. Also, we need not address Winstead's argument that he is protected by the fiduciary shield doctrine, which "precludes a state from exercising jurisdiction over an individual sued in his or her personal capacity if the only basis for jurisdiction is his or her contacts with the forum in which he or she was acting solely as a fiduciary of a corporation." *Intermatic, Inc. v. Taymac Corp.,* 815 F.Supp. 290, 293 (S.D.Ind.1993). As Chief Judge Pratt of the Southern District of Iowa recently observed, "This doctrine is exclusively a creation of state law, and numerous federal courts have declined to consider its applicability when the state's long-arm statute is

16. In summary, the facts most favorable to finding jurisdiction are that Leone wrote his opinion letter to Paul Rubera, mailed it to Oregon and Nevada, and knew that Rubera and his entities placed the letter in Sales Manuals given to sales agents all over the United States.

17. Applying these facts to the "contacts test" recited . . . above, the Court finds as follows:

(a) does the claim arise from Leone's contacts with Indiana? No—Leone had no direct contact with Indiana, just indirect contact because the [opinion] letter he sent to Nevada and Oregon found its way into a Sales Manual that Indiana sales agents used.

(b) Leone's overall contacts with Indiana; very limited to none; just the letter noted in the findings above, which he did not send to anyone in Indiana.

coterminous with the full reach of due process." *Int'l Adm'rs v. Pettigrew,* 430 F.Supp.2d 890, 898 (S.D.Iowa 2006).

> While certainly an individual's contact with a forum exclusively as a corporate officer or agent cannot, standing alone, give rise to jurisdiction over that person in an individual capacity, Supreme Court jurisprudence has made clear that this means only that the contacts of each defendant must be assessed individually, not that one's corporate status automatically places that person beyond the court's jurisdiction.

*Id.* at 899 (citing, *inter alia, Calder,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804, and *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984)). The fiduciary shield doctrine has been applied in only one decision by this Court, *see Ryan v. Chayes Va., Inc.,* 553 N.E.2d 1237, 1239–40 (Ind.Ct.App.1990), *trans. denied and abrogated on other grounds by Anthem,* 730 N.E.2d 1227. In *Intermatic,* District Judge McKinney concluded that the Indiana Supreme Court "would decline to adopt the fiduciary shield doctrine and would not follow the decision of the Court of Appeals of Indiana in *Ryan.*" 815 F.Supp. at 296.

(c) whether Leone expected or encouraged contacts with Indiana; Plaintiffs presented no evidence that Leone ever encouraged contact with Indiana, and the only evidence was that Leone knew the letter was in the Sales Manual and may have had reason to know that sales were being made in Indiana.

(d) foreseeability for suit in Indiana; Plaintiffs presented no evidence bearing on foreseeability. Under Plaintiffs' theory, apparently Leone should have expected suits in all fifty states due to this one letter being mailed to Oregon and Nevada.

Appellants' App. at 355–56.

In sum, Leone's contacts with Indiana are even more indirect and attenuated than Winstead's. Appellants contend that Leone failed to carry his burden of disproving personal jurisdiction by a preponderance of the evidence.[17] Although Leone, unlike Winstead, did not "attempt to negate travel, correspondence, tele-phone calls, or other contacts with Indiana[,]" Appellants' Br. at 26, the fact remains that Appellants' fourth amended complaint does not assert that Leone had any such contacts with Indiana. Leone need not prove the negative of facts that Appellants did not allege in the first place.

The evidence designated on summary judgment, which the trial court construed in Appellants' favor, establishes that Leone did not know that payphone program sales representatives were showing his opinion letter—which did not address the legality of the payphone program under Indiana law—to customers in general and to Appellants in particular.[18] *Cf. Wallace v. Frank*, 662 F.Supp. 876, 882 (E.D.Mich.1987) (appendix) (finding personal jurisdiction over New York law firm where "record viewed as a whole" indicated that firm "prepared a very substantial opinion letter aware both of the kind of business [defendant] was engaged in and of the use to which the letter would be put and that it might well be relied on by

---

**17.** The summary judgment order states, "Leone's briefs have caused the Court great difficulty in deciding this Motion. Leone seems more concerned with saying as many negative things as he can say about opposing counsel, rather than focusing on the issues' merits." Appellants' App. at 352. *See, e.g., id.* at 244 (Leone's supplemental summary judgment brief: "If the Courts don't care enough to clean up the sewage clogging their dockets, the shady shysters like Mr. Bell and the monetary jackals of Cohen & Malad, the self proclaimed 'Broker Busters', will come back again and again in lots of little towns."). Unfortunately, Leone has taken a similar tack on appeal. *See, e.g.,* Leone's Br. at 23 ("Gosh, Leone hates to raise more negative questions about Pls. counsel but they just keep pumping out the stink!"); *id.* at 30 (accusing Appellants of "smearing Leone with horse manure accusations thrown by other strikesuit jackals like the self-proclaimed 'Broker Busters' Cohen & Malad"). Such puerile and intemperate language has no place in an appellate brief. Therefore, we admonish Leone—a practicing attorney—to adopt a more dignified tone in any future proceedings before this Court. *See Hoosier Outdoor Advertising Corp. v. RBL Mgmt., Inc.,* 844 N.E.2d 157, 162 (Ind.Ct.App.2006) ("The use of impertinent, intemperate, scandalous, or vituperative language in an appellate brief opens it to being stricken by this court."), *trans. denied.*

**18.** In its summary judgment order, the trial court noted, "Leone's deposition states that Leone understood his opinion would be presented to the agents, not the investors, and he did not know investors had seen his opinion. His opinion letter, he stated, specifically made his opinion confidential and not to be disclosed to the public." Appellants' App. at 354 (referring to pages 35 and 36 of Leone's deposition). Page 35 of Leone's deposition, which appears on page 456 of Appellants' appendix, does not mention these statements. Curiously, page 36 of the deposition does not appear in the appendix.

investors in Michigan.").[19] More to the point, the designated evidence establishes that Leone did not purposely avail himself of the privilege of conducting activities within Indiana and could not reasonably have anticipated being haled into court here. *See Brockman*, 779 N.E.2d at 1256; *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984) ("[U]nilateral activity of another party or a third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a foreign State to justify an assertion of jurisdiction."). We therefore affirm the trial court's grant of summary judgment in favor of Leone on the issue of personal jurisdiction.[20]

Affirmed.

KIRSCH, C.J., and BAILEY, J., concur.

---

19. We are unpersuaded by Appellants' reliance on *Black & Co. v. Nova–Tech, Inc.*, 333 F.Supp. 468 (D.Or.1971), in which the Oregon district court found personal jurisdiction over an employee in a California law firm who "prepared the legal papers necessary to Nova–Tech to complete the sale of its [unregistered] securities" in Oregon. *Id.* at 472. In considering whether the employee had participated in the sale of unregistered securities and was therefore a proper person to be served under an Oregon statute, the court determined that even if the employee "did not know and could not have known of Nova–Tech's failure to register the securities, he was a participant in the sale because, without his assistance, the sale would not have been accomplished." *Id.* There is no indication that Leone's opinion letter was "necessary" to complete the payphone sales in Indiana; indeed, the opinion letter does not address the legality of the payphone program under Indiana law. We are likewise unpersuaded by *Oregon v. Houston*, 42 Or.App. 287, 600 P.2d 886 (1979), *rev. denied* (1980), in which the out-of-state defendant's "substantial and continuous" contacts with Oregon included "arrang[ing] for the formation of the corporation and the registration of it to do business in [Oregon]" and "[making] representations to the [Oregon Corporation] Commissioner as to the financial status and accounting procedures of the corporation." *Id.* at 890. Leone's contacts with Indiana fall far short of this mark.

20. Given our resolution of this issue, we need not specifically address matters such as whether Leone properly cited to his appellant's appendix in a related appeal and whether Leone properly moved to strike his own opinion letter from the record for the first time on appeal. Suffice it to say that we have found no precedent for these tactics. Likewise, we need not address Leone's arguments regarding the merits of Appellants' claims against him. We also decline Leone's invitation to consider his allegations of Appellants' misconduct and the trial court's failure to take disciplinary action against Appellants, which we address in *Leone v. Keesling*, 18A04–0510–CV–626, 858 N.E.2d 1009 (Ind. App.2006).