## FOR PUBLICATION



FILED
Jan 09 2014, 10:39 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANTS:

**DARREN A. CRAIG**
**NELSON D. ALEXANDER**
**JULIA BLACKWELL GELINAS**
Frost Brown Todd LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES:

**TODD A. RICHARDSON**
**THOMAS R. RUGE**
**MATTHEW S. TARKINGTON**
Lewis & Kappes, P.C.
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| JOEL BOWDEN, RUBY BOWDEN, GOLDEN COMPANIES, INC., and GOLDEN PURCHASING AND STAFFING, INC., | ) ) ) ) | |
| Appellants-Defendants, | ) ) | |
| vs. | ) ) | No. 49A05-1301-PL-23 |
| E.J. AGNEW and GOLDEN-AGI, LLC, | ) ) | |
| Appellees - Plaintiffs. | ) ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Theodore Sosin, Judge
Cause No. 49D02-0910-PL-47070

**January 9, 2014**

**OPINION - FOR PUBLICATION**

**FRIEDLANDER, Judge**

Joel and Ruby Bowden, Golden Companies, Inc., and Golden Purchasing and Staffing, Inc. (collectively referred to as the Bowdens) appeal a multi-million-dollar judgment entered against them and in favor of E.J. Agnew and Golden-AGI, LLC (collectively referred to as Agnew). The Bowdens present the following restated and reordered issues for review:

1. Did the trial court have personal jurisdiction over Joel and Ruby Bowden?

2. Was it an abuse of discretion for the trial court to permit an accountant retained by Agnew to offer expert opinion testimony?

3. Did the trial court properly determine that the Bowdens committed criminal conversion, thus entitling Agnew to treble damages?

We affirm in part, reverse in part, and remand.

This case involves a business venture between Agnew and the Bowdens. Agnew is a former employee of Cummins, Inc. During his lengthy employment with Cummins, Agnew worked extensively in developing outsourcing contracts with international auto parts manufacturers. He retired from Cummins in June 2003.

Joel and Ruby Bowden are residents of North Carolina and own, control, and operate a suite of North Carolina businesses, including Golden Companies and Golden Purchasing and Staffing (collectively referred to as Golden).[1] Joel owns 49% of Golden and acts as the CFO and legal counsel, while Ruby is the CEO and owns 51%. At all relevant times, John Lockart was the controller for Golden.

Agnew met the Bowdens during and in connection with his employment at Cummins.

---

[1] Joel Bowden is also a practicing attorney licensed in North Carolina.

In 2003 and 2004, the Bowdens and Agnew discussed doing business together and eventually entered into an agreement. Agnew's responsibility was to develop business with United States auto and truck producers and arrange for and supervise the production and delivery of parts from overseas manufacturers. The Bowdens' responsibilities were to provide accounting services, maintain separate books and records, raise capital, secure financing, warehouse parts, and provide other support state-side. To facilitate their relationship, the parties organized Golden AGI, LLC (GAGI) at the end of 2004. GAGI's operating agreement was signed by Agnew and the Bowdens on May 26, 2005, making them 50/50 owners.

In the meantime, Agnew secured a commitment with International Truck and Engine Corporation (International) to supply parts manufactured in India. Under the terms of their business relationship, the Bowdens and Agnew were to split any net profits from the International deal 50/50. After obtaining a letter of intent from International, Agnew negotiated sourcing agreements with two Indian suppliers. Agnew and the Bowdens signed the sourcing agreements in July and November 2004.

The International arrangement required a letter of credit to be in place with the State Bank of India (SBI) in order for the parts to be shipped to the United States. SBI required a 100% cash deposit as collateral and security for payments to the overseas manufacturers. The Indian suppliers would draw funds off the letter-of-credit account at the time the bills of lading were issued. The parts were shipped to a Golden facility in Indiana, and then Golden would deliver the parts to International as needed and invoice International for payment.

3

Golden opened the letter of credit with SBI in December 2004. The first pre-production parts were shipped from India in March 2005, and production parts began shipping in July.[2] There were some quality issues up front, which were quickly resolved. From 2005 to 2007, International parts were delivered on a regular basis to the Indiana facility and through 2008, the project had generated no less than $46,009,607 in gross revenues. During this time, the Bowdens regularly travelled to Indiana to visit Golden's Indianapolis facility, attend quarterly meetings, and conduct various other business.

Before and during the International project, the Bowdens and Golden were involved in a separate project unrelated to GAGI and Agnew. This was a project involving Cummins and the Robert Bosch Corporation (Bosch). Under this project, Golden purchased parts from Bosch and then provided light assembly work and warehoused the parts until transferred to Cummins. At all relevant times, Cummins paid Golden 15 days after delivery of the parts to Cummins. Bosch, however, did not require payment from Golden until 75 days after delivery to Golden. This created a 60-day float. Golden held between $5-6 million in float money at various times relevant to this appeal.

At some point during the International deal, the Bowdens began using the Cummins float to fund the SBI letter of credit for the International deal because they were unable to secure financing. As of October 2005, $4 million of float money had been deposited in the SBI account to fund payments to the Indian suppliers as the parts were shipped. These funds

---

[2] International and the Indian suppliers incurred and paid for all capital, equipment, and tooling costs associated with the project.

were eventually recouped (along with profits) as International received and paid for the parts. Agnew was not aware of the Bowdens' decision to use the float money prior to it being used.

Bosch eventually complained to Cummins that Golden had been late in making payments. As of April 25, 2005, Golden was in arrears to Bosch in excess of $10 million. Cummins also began expressing other concerns about Golden as a supplier and started putting pressure on Golden.[3] By October 2005, Golden was in arrears to Bosch for no less than $7.7 million, approximately $4 million of which was tied up in the International deal.

In December 2005, Cummins stepped in and paid $3.8 million to Bosch on Golden's behalf in order to keep parts coming from Bosch. Joel Bowden promised Cummins that the money from the International deal would be returned to Cummins as it was released. There was more than $6.7 million in the SBI letter-of-credit account at the time, which was more than sufficient to cover the $4 million obligation.

Cummins paid $1 million in October 2006 on Golden's behalf to another supplier so that production would not be interrupted by Golden's failure to pay. This again was unrelated to the International deal or GAGI. In addition to other expenses, Cummins paid at total of approximately $5.4 million to third parties on Golden's behalf for Golden obligations. Cummins pursued repayment from Golden. On November 30, 2006, Joel Bowden executed an assignment in favor of Cummins of all accounts payable to GAGI from International. In exchange, Cummins provided the Bowdens and Golden with a covenant not to sue. The assignment of GAGI revenues from International was made without Agnew's

knowledge or consent. Thereafter, in July and August 2007, International paid over $1.2 million to Cummins pursuant to the assignment. Cummins and International severed ties with the Bowdens in or about 2008. The Bowdens eventually recouped all funds remaining in the SBI account after the International project ended.

Agnew ceased working on the project in October 2007. In a recorded meeting with Joel Bowden the following month, Bowden admitted to Agnew that the International deal was profitable and that Agnew was owed profits. Bowden promised to provide Agnew with a number at a later date, which he never did. Throughout their business deal, Agnew repeatedly requested in vain to see detailed GAGI financials, as he had been falsely informed by Bowden that GAGI had separate books. In actuality, GAGI income and expenses were comingled with that of other Golden entities as a matter of course. Unbeknownst to Agnew, the Bowdens never operated or intended to operate GAGI as a functional business entity. Tax records show that all income and expenses for the International deal were claimed by Golden Purchasing and Staffing.

Agnew filed his complaint for money damages against the Bowdens on October 13, 2009, requesting an accounting and asserting claims of breach of contract, conversion, and civil conspiracy. The Bowdens filed a motion to dismiss for lack of personal jurisdiction and on grounds of forum non conveniens. Following a hearing, the trial court denied the motion. Agnew later amended the complaint to add claims to pierce the corporate veil and for

---

[3] The record indicates that Golden was losing money on the Cummins deal in 2004 and 2005. During this time, the Bowdens took no less than $1,650,000 in officer loans from Golden that they did not pay back.

6

constructive fraud.

The two-day bench trial commenced on August 28, 2012. The court received into evidence over one hundred exhibits by stipulation. The parties submitted a detailed stipulation of facts. Additional evidence and exhibits were also admitted at trial. Of particular relevance to this appeal, Agnew called David DeWitt, a licensed CPA, as an expert witness to testify regarding the profits derived from the International deal. DeWitt testified in detail regarding his expert opinion that Agnew's share of profits from the deal were at least $1,754,278, which he indicated was a conservative number. The Bowdens presented no expert testimony. Instead, they relied on their cross-examination of DeWitt, Joel Bowden's testimony, and a four-page spreadsheet of income and expenses that was created by Lockart (Golden's controller who was not a CPA and did not testify at trial) in anticipation of trial. Lockart's report concluded that the project resulted in a net loss of nearly $100,000. During his testimony, DeWitt opined that Lockart did not properly allocate indirect expenses between GAGI and Golden and made numerous double entries that resulted in inflated expense figures.

After trial, Agnew moved for leave to amend the pleadings to conform to the evidence presented at trial. This motion was granted. The second amended complaint asserted claims for breach of contract, breach of fiduciary duty, embezzlement and civil conversion, civil conspiracy, disregard of corporate formalities, fraud and constructive fraud, and an accounting.

On December 20, 2012, the trial court entered a forty-nine-page order with extensive

findings of fact and conclusions of law. Crediting DeWitt's testimony and calculations, the court found that compensatory damages amounted to $1,754,278. Further, the court entered an award of treble damages upon its conclusion that the Bowdens had committed conversion with respect to the International revenues. The court also awarded Agnew attorney fees and costs. The Bowdens now appeal.

On appeal following a bench trial, the trial court's findings and judgment are not to be set aside unless clearly erroneous, and due regard is to be given to the trial court's ability to assess the credibility of witnesses. *Fraley v. Minger*, 829 N.E.2d 476 (Ind. 2005). A judgment is clearly erroneous when there is no evidence to support the findings, the findings fail to support the judgment, or when the trial court applies the wrong legal standard to properly found facts. *Id.* While findings of fact are reviewed for clear error, we do not defer to the trial court's conclusions of law, which are reviewed de novo. *Id.* In order to make a finding of clear error, our review of the evidence must leave us with a firm conviction that a mistake has been made. *Id.*

1.

We initially address Joel and Ruby Bowdens' brief argument that the trial court lacked personal jurisdiction over them in their individual capacities. While they do not deny contacts with Indiana, the Bowdens seek protection under the fiduciary shield doctrine and assert that all of their actions "at issue in this case were taken in their capacities as officers of Golden Companies or Golden Purchasing and Staffing" and "[they] have had no contacts with Indiana, aside from operating those businesses." *Appellants' Brief* at 15.

The corporate shield doctrine "precludes a state from exercising jurisdiction over an individual sued in his or her personal capacity if the only basis for jurisdiction is his or her contacts with the forum in which he or she was acting solely as a fiduciary of a corporation." *Keesling v. Winstead*, 858 N.E.2d 996, 1006 n.16 (Ind. Ct. App. 2006) (citing *Intermatic, Inc. v. Taymac Corp.,* 815 F.Supp. 290 (S.D. Ind. 1993)).   In recent years, the doctrine has received extensive criticism, and numerous federal courts have declined to apply it where the state's long-arm statute is, like Indiana's,[4] coextensive with the full reach of federal due process. *See Keesling v. Winstead*, 858 N.E.2d 996 (citing *Int'l Adm'rs v. Pettigrew*, 430 F.Supp.2d 890 (S.D. Iowa 2006)).  *See also Intermatic, Inc. v. Taymac Corp.,* 815 F.Supp. at 296 (concluding that the Indiana Supreme Court would decline to adopt the doctrine, which "limits the jurisdictional reach of a state to less than that which is allowed by due process" and is, therefore, "contrary to the well-established interpretation given to Indiana's long-arm

---

[4]  Indiana's long-arm statute, Ind. Trial Rule 4.4(A), provides:

> **Acts Serving as a Basis for Jurisdiction.** Any person or organization that is a nonresident of this state…submits to the jurisdiction of the courts of this state as to any action arising from the following acts committed by him or her or his or her agent:
> (1) doing any business in this state;
> (2) causing personal injury or property damage by an act or omission done within this state;
> (3) causing personal injury or property damage in this state by an occurrence, act or omission done outside this state if he regularly does or solicits business or engages in any other persistent course of conduct, or derives substantial revenue or benefit from goods, materials, or services used, consumed, or rendered in this state;
> (4) having supplied or contracted to supply services rendered or to be rendered or goods or materials furnished or to be furnished in this state;
> (5) owning, using, or possessing any real property or an interest in real property within this state;
> * * *
> In addition, a court of this state may exercise jurisdiction on any basis not inconsistent with the Constitutions of this state or the United States.

statute").[5]

> While certainly an individual's contact with a forum exclusively as a corporate officer or agent cannot, standing alone, give rise to jurisdiction over that person in an individual capacity, [U.S.] Supreme Court jurisprudence has made clear that this means only that the contacts of each defendant must be assessed individually, not that one's corporate status automatically places that person beyond the court's jurisdiction.

*Keesling v. Winstead*, 858 N.E.2d at 1006 n.16 (quoting *Int'l Adm'rs v. Pettigrew*, 430 F.Supp.2d at 899). Moreover, where the corporation is "nothing more than the alter ego of the individually named defendants, 'courts attribute a corporation's contacts with the forum state to an individual defendant for jurisdictional purposes.'" *Int'l Adm'rs v. Pettigrew*, 430 F.Supp.2d at 899 (quoting *Stuart v. Spademan,* 772 F.2d 1185, 1197 (5th Cir.1985)).

On these principles, we conclude that the Bowdens' status as corporate agents of their closely-held corporations does not shield them from the exercise of personal jurisdiction in this case, where the facts support a conclusion that such jurisdiction complies with the requirements of due process. The Bowdens were the sole shareholders of Golden Companies and Golden Purchasing and Staffing, and the record reflects that they signed the GAGI operating agreement in their individual capacities. In doing so, the Bowdens acted as entrepreneurs entering into a business relationship with an Indiana resident to create a new business with significant operations in Indiana. Agnew seeks his share of profits from the joint venture which he and the Bowdens agreed to share evenly and which he alleged were

---

[5] The doctrine has been applied in only one decision by this court. *See Ryan v. Chayes Va., Inc*., 553 N.E.2d 1237 (Ind. Ct. App. 1990), *trans. denied and abrogated on related but different grounds by Anthem Ins. Cos., Inc. v. Tenent Healthcare Cor*p., 730 N.E.2d 1227 (Ind. 2000).

10

converted by the Bowdens for their own personal use. The record reflects that the Bowdens'

contacts with Indiana were not executed solely as corporate officers in their representative

capacity and, further, that their closely-held companies were their alter egos. Under the

circumstances, the trial court properly determined that the Bowdens were subject in their

individual capacities to the personal jurisdiction of our courts.

2.

The Bowdens next challenge DeWitt's expert opinion testimony offered by Agnew to

establish the profitability of the Project. They argue that the trial court abused its discretion

by permitting DeWitt to testify as an expert because he "never requested information from

the officers who ran the project [(i.e., Joel and Ruby Bowden)], excluded entire categories of

expenses from the calculation of profitability, and excluded an entire year of expenses from

calculating the project's profitability." *Appellants' Brief* at 1. In sum, the Bowdens contend

that DeWitt did not have an adequate factual basis upon which to offer an opinion and that

his testimony should have been excluded.

Agnew correctly observes that the Bowdens waived this issue for appellate review, as

they did not object below to DeWitt's qualification as an expert witness or to the

admissibility of his expert testimony. These arguments may not be raised for the first time on

appeal. *See Plank v. Cmty. Hosp. of Ind., Inc.*, 981 N.E.2d 49, 53 (Ind. 2013) ("[d]eclining to

review an issue not properly preserved for review is essentially a 'cardinal principal of sound

judicial administration'") (quoting *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868

(1991)).

11

Waiver notwithstanding, we conclude that DeWitt's expert testimony was admissible. For an expert opinion to be admissible, the expert must be qualified "by knowledge, skill, experience, training, or education" and his or her technical or specialized knowledge must be helpful to the trier of fact to understand the evidence or to determine a fact in issue. Ind. Evidence Rule 702(a). Further, the expert must have sufficient facts or data upon which to form an opinion. *See Halterman v. Adams Cnty. Bd. Of Comm'rs*, 991 N.E.2d 987 (Ind. Ct. App. 2013).

DeWitt testified that he is a licensed CPA and has been practicing since 1979. To determine GAGI profits, DeWitt testified that in addition to speaking with Agnew and Lockart, he reviewed income statements, general ledgers, audit reports, corporate tax returns, and "a plethora of other documents that had been provided" in discovery. *Transcript* at 350. He testified that data was cross-checked and that he had a "sufficient and adequate basis" upon which to make his calculations and develop reliable opinions. *Id.* at 352. Evid. R. 702(a) was satisfied here.

Much of the Bowdens' argument goes to the weight that should have been accorded DeWitt's testimony rather than its admissibility. In this regard, we observe that DeWitt was thoroughly cross-examined at trial and steadfastly stood by his calculations. Aware of the challenges asserted by the Bowdens, the trial court expressly found DeWitt's testimony credible,[6] explained in detail its reliance on the expert's calculations, and concluded in part:

> 66. No particular degree of certainty is required in awarding

---

[6] In fact, the court found DeWitt's calculation of damages to be "quite conservative in nature." *Appellants' Appendix* at 43.

damages so long as the amount awarded is supported by the evidence and not based merely on speculation or conjecture. JKL Components Corp. v. Insul-Reps, Inc., 596 N.E.2d 945, 954 (Ind. Ct. App. 1992).

67. Plaintiffs have readily met this burden of proof. Mr. DeWitt provided the Court with a detailed report and testimony regarding Agnew's measure of damages. DeWitt's measure of damages was supported by the evidence and is neither speculative nor based upon conjecture.

*Appellants' Appendix* at 61. The Bowdens, who have not directly challenged any of the trial court's specific findings or conclusions, have failed to establish that the trial court's reliance on DeWitt's expert testimony regarding damages was clearly erroneous.

3.

Finally, the Bowdens challenge the award of treble damages, contending that there was no basis for imposing liability for conversion because Agnew never entrusted the Bowdens with an identifiable fund of money. In awarding treble damages, the trial court found that the Bowdens had wrongfully assigned monies due GAGI from International to repay separate Golden obligations to Cummins and failed to provide Agnew with the net revenues due him under their agreement. The court concluded that Agnew had established by a preponderance of the evidence that the Bowdens "knowingly and intentionally converted no less than $1,754,278 in monies rightfully due Agnew under the business relationship." *Id.* at 45.

Ind. Code Ann. § 34-24-3-1 (West, Westlaw current through 2013 1st Reg. Sess. & 1st Reg. Technical Sess.) provides for recovery of up to three times actual damages, as well as costs and attorney fees, if a plaintiff proves the elements of criminal conversion by a preponderance of the evidence. Our cases make clear, however, that money may be the

13

subject of an action for conversion only if it is capable of being identified as a special chattel. *Huff v. Biomet, Inc.*, 654 N.E.2d 830 (Ind. Ct. App. 1995), *abrogated on other grounds by St. Vincent Hosp. & Health Care Ctr., Inc.*, 766 N.E.2d 699 (Ind. 2002). In other words, it must be "a determinate sum with which the defendant was entrusted to apply to a certain purpose." *Trietsch v. Circle Design Grp., Inc.*, 868 N.E.2d 812, 821-22 (Ind. Ct. App. 2007). It is well established that refusal to pay a debt will not generally support a conversion claim. *See, e.g., Newland Res., LLC v. Branham Corp.*, 918 N.E.2d 763, 776 (Ind. Ct. App. 2009) (conversion claim dismissed because plaintiff "did not identify the money at issue as separate chattel"); *Tobin v. Ruman*, 819 N.E.2d 78 (Ind. Ct. App. 2004) (law firm's wrongful withholding of lawyer's share of retained earnings constituted failure to pay a debt and did not constitute criminal conversion as a matter of law), *trans. denied*; *Huff v. Biomet, Inc.*, 654 N.E.2d 830 (wrongful withholding of sales commissions did not constitute criminal conversion where there was no evidence that the money was entrusted to defendant for a particular purpose or that defendant retained specific funds that could be directly attributed to plaintiff).

In the instant case, the trial court concluded that the funds due Agnew were a "determinable sum" because "Agnew and the Bowdens agreed to work together in a 50/50 business relationship." *Appellants' Appendix* at 55. The court continued:

> 43. …The Defendants were entrusted with the funds to fulfill a certain purpose − namely, to distribute the funds in accordance with the 50/50 arrangement. Agnew believe GAGI to be a going concern (independent of Golden) throughout the relationship. Yet, unbeknownst to Agnew, the Bowdens treated GAGI as nothing more than a "shell" company or a conduit by which they intermingled and transferred revenues for their own benefit −

14

resulting in there being insufficient money to pay Agnew his share.

44. During the course of the relationship, the Bowdens knowingly exerted unauthorized control over Agnew's property – including net revenues rightfully due him from the International deal. The Bowdens exerted this control with the intent to use the money for themselves, and thus, deprive Agnew of his value and use of the GAGI net profits.

45. The Bowdens also wrongfully assigned GAGI monies due Agnew without Agnew's knowledge or consent and for the Bowdens' own benefit. The Bowdens diverted monies from the profitable International deal to pay unrelated Golden's expenses [sic] and obligations.

*Id*. at 38-39.

The Bowdens' wrongful failure to distribute net revenue in accordance with the 50/50 agreement constitutes a failure to pay a debt, not criminal conversion. The money withheld from Agnew was not a separate, specifically identifiable chattel. *Cf. Kopis v. Savage*, 498 N.E.2d 1266 (Ind. Ct. App. 1986) (seller's retention of $40,000 deposit after the property deal collapsed was not criminal conversion because he was under no contractual obligation to "return *the specific* $40,000 which [purchaser] had given him", as the parties did not set up an escrow account or deliver the money to a third party for safekeeping (emphasis in original)). On the contrary, the agreement between Agnew and the Bowdens contemplated that the funds provided by International would be used to pay GAGI expenses, with the resulting net revenue divided evenly between the parties.

Agnew directs us to *Midland-Guardian Co. v. United Consumers Club, Inc*., 502 N.E.2d 1354 (Ind. Ct. App. 1987), *trans. denied*, in support of its conversion claim. In *Midland*, this court continued to adhere to the rule that money may be the subject of an action for conversion only if it constitutes "a separate identifiable chattel". *Id*. at 1355. We then held that the money at issue was separately identifiable chattel:

15

Midland and UCC were engaged in an ongoing business relationship in which Midland purchased installment contracts from UCC. Midland paid an agreed upon price for the contracts, but retained a set percentage of the purchase price for use as a contingency fund. The contingency fund, the holdback reserve account, belonged to UCC, subject only to Midland's right to charge back uncollectible contracts according to a pre-arranged formula.

These specific funds were, in effect, entrusted to Midland to be separately held and accounted for. The holdback reserve agreements did not create an obligation to repay a debt, instead they placed Midland in a position of responsibility to return the remainder of these separately identified accounts at the appropriate time. It is the breach of this trust, by knowingly exercising unauthorized control over UCC's property, that led to Midland's being found liable for criminal conversion.

*Id.* *Midland* is not on par with the facts of the case at hand, where no specific, identifiable funds were entrusted to the Bowdens to be held in a separate account for Agnew.

The trial court erred in awarding treble damages under I.C. § 34-24-3-1.[7] We, therefore, remand for correction of the judgment to award damages in the amount of $1,754,278.

Judgment affirmed in part, reversed in part, and remanded.

VAIDIK, C.J., and BAKER, J., concur.

---

[7] Agnew's request that we award appellate attorney fees under this statute is denied.