FILED

May 08 2020, 8:32 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEYS FOR APPELLANT

Margaret M. Christensen
Andrew M. Pendexter
Dentons Bingham Greenebaum, LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Christopher C. Murray
John A. Drake
Ogletree Deakins Nash Smoak &
Stewart, PC
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Robert Carmichael,

*Appellant-Defendant,*

v.

Separators, Inc.,

*Appellee-Plaintiff.*

May 8, 2020

Court of Appeals Case No.
19A-PL-1821

Appeal from the Johnson Superior
Court

The Honorable Marla K. Clark,
Judge

Trial Court Cause No.
41D04-1509-PL-91

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Defendant, Robert Carmichael (Carmichael), appeals following the trial court's entry of default judgment and award of exemplary and compensatory damages against him and his co-defendants, Olice Monday (Monday) and Centrifuge Supplies, Inc. (CSI), (collectively, the Defendants),[1] in favor of Appellee-Plaintiff, Separators, Inc. (Separators).

We affirm.

# ISSUES

Carmichael presents this court with four issues, which we consolidate and restate as the following three:

> (1) Whether the trial court's entry of a default judgment against Carmichael and his co-defendants as a sanction for spoliation of evidence in contempt of its discovery orders was clearly erroneous;
>
> (2) Whether the trial court properly denied Carmichael's motion for summary judgment; and
>
> (3) Whether the trial court's award of exemplary and compensatory damages was clearly erroneous.

---

[1] The judgments and damages were entered against all the Defendants. Monday and CSI do not participate in this appeal.

# FACTS AND PROCEDURAL HISTORY

[4] Separators was founded in 1985 and provides its customers with centrifuge services, equipment, and parts. Over the course of its corporate existence, Separators amassed a collection of reference materials pertaining to the provision and maintenance of centrifuges to its customers (the technical library). The technical library contained hundreds of original equipment manufacturer manuals (the manuals), some of which had been modified with notes regarding specific alterations to Separators' customers' centrifuges. Separators had converted the technical library to an electronic format, a laborious process that entailed manually scanning thousands of pages of documents. The technical library was password protected, and Separators did not allow the general public or its competitors to access it. In addition to the technical library, Separators stored other types of data on its computer network, including customer parts lists, customer quotes, and other sales and financial information. The Separators' employee handbook provided that employees were not to copy any of Separators' data files without the company's permission.

[5] From 2005 to 2013, Carmichael was the parts manager for Separators, a job which entailed interfacing with Separators' customers on a regular basis. Separators had hired Monday in 2002, and he became Carmichael's assistant in the parts department. Neither Carmichael nor Monday signed a non-compete, non-solicitation, or confidentiality agreement with Separators. In December 2012, Carmichael formed CSI as a direct competitor to Separators. Carmichael

was the president and sole shareholder of CSI. Carmichael formally resigned from Separators on March 8, 2013. Before he left the company, Carmichael copied hundreds of manuals from the technical library and subsequently copied those electronic files onto his CSI computer, all without Separators' consent.

[6] After Carmichael left, Monday became the manager of Separators' parts department. On February 20, 2015, Monday left Separators to begin working for CSI as its vice president. Before he left Separators, and without the company's consent, Monday copied thousands of data files relating to Separators' business, including the manuals, sales documents, service parts lists, and customer quotes, onto a Seagate USB Device (Seagate USB) and a Pockey USB Device (Pockey USB). On February 23, 2015, Monday's first day of work at CSI, Monday downloaded the data from the Seagate and Pockey USBs onto his CSI computer. Monday had internet-based data backup for his CSI computer on an ASUS WebStorage account (ASUS account), and he had another internet-based data storage account with Microsoft OneDrive (OneDrive account). Carmichael used a Western Digital Passport drive (WDP drive) to back-up financial data from his CSI computer prior to moving to an internet-based accounting system.

[7] On September 14, 2015, Separators filed its Verified Complaint for Injunctive Relief and Damages (Complaint) alleging that the Defendants had copied and taken "Separators' files containing proprietary and trade secret information including, but not limited to, parts lists, customer lists, supplier information, custom parts drawings, manuals, and financial reports[,]" and thus had

"accessed, copied and used a significant portion of Separators' technical, commercial, and financial library." (Appellant's App. Vol. III, pp. 40, 42). Separators raised claims of misappropriation of trade secrets pursuant to the Indiana Uniform Trade Secrets Act (IUTSA) (all Defendants); breach of fiduciary duty/duty of loyalty and computer trespass (Carmichael and Monday); and tortious interference with business relationships, unfair competition, unjust enrichment, conversion, theft, and civil conspiracy (all Defendants). In conjunction with its Complaint, Separators sought a temporary restraining order (TRO) on CSI's unfairly competitive business activities. Separators also sought orders directing the preservation of evidence within the Defendants' possession or control and for expedited discovery.

[8]     On September 14, 2015, the trial court issued a TRO that enjoined the Defendants from using Separators' trade secrets and confidential information to compete against Separators. The trial court also issued its Order Preserving Electronic Evidence (OPEE) that directed the Defendants to

> preserve all electronically stored date in their possession, custody, or control relating to Separators, including emails or data that exists or existed (before being deleted) on any computer, laptop, PDA, backup tape, CD, DVD, USB drive, cloud storage, or other media (including all metadata and tags).

(Appellant's App. Vol. III, p. 157). The trial court ordered the Defendants to comply with Separators' expedited discovery requests by September 22, 2015, and it set a hearing on Separators' motion for a preliminary injunction for September 23, 2015.

[9] On September 14, 2015, Carmichael was personally served with the Complaint, TRO, and OPEE at 6:00 p.m. Monday was with Carmichael when Carmichael was served. At 6:03 p.m. on September 14, 2015, approximately 100 files related to Separators were deleted from the Pockey USB. At 7:10 p.m. on September 14, 2015, after Monday had been personally served with the same documents, 1063 items related to Separators were deleted from the Seagate USB. Sometime after September 14, 2015, Carmichael deleted approximately twenty emails from his CSI computer that were potentially related to Separators.

[10] On September 23, 2015, the trial court entered a stipulated preliminary injunction order (PI) which enjoined the Defendants from

> destroying, erasing, or otherwise making unavailable for further proceedings in this matter, any records or documents (data or information maintained in computer media, including Defendants' personal computers, drives, email, and other media) in Defendants' possession, custody, or control that were obtained from or derived from any Separators [] documents, data, records, or information.

(Appellant's App. Vol. III, p. 160). The PI also ordered the Defendants to produce their computers and electronic data storage devices, which, according to an agreed inspection order (AIO) entered in conjunction with the PI, included "any and all devices and media used to store electronic information[.]" (Appellant's App. Vol. III, p. 164). These items were to be produced to computer forensics expert Rebecca Green (Green) for inspection.

Between September 22, 2015, which was the day before the hearing on Separators' motion for a preliminary injunction, and September 24, 2015, the day that the Defendants' computers, electronic data storage devices, and media were to be turned over to Green for inspection, at least 932 files relating to Separators were deleted from Monday's CSI computer.

[11] On September 24, 2015, in order to comply with the TRO, OPEE, PI, AIO, and the trial court's order granting Separators' expedited discovery requests (collectively, the discovery orders), Carmichael and Monday met with Green at the CSI business premises. While there, Green specifically asked Carmichael and Monday whether they had any internet-based data storage that was implicated by the discovery orders. Carmichael and Monday disclosed their internet-based accounting system and produced their CSI computers and the Seagate USB, but they failed to produce the WDP drive and failed to disclose the ASUS and OneDrive accounts.[2] On October 5, 2015, the day before the Pockey USB was scheduled to be turned over to Green for inspection, approximately 3000 images were uploaded onto the USB, rendering the previously-deleted data irretrievable.

[12] As a result of her forensic investigation, Green discovered the deletions from the Seagate and Pockey USBs and the CSI computers, the existence of the

---

[2] The trial court found that Carmichael also failed to disclose an additional internet-based data storage account at Dropbox, but it does not appear that the trial court relied upon the non-disclosure of that account in its conclusions of law sanctioning the Defendants.

undisclosed internet-based data storage sites and the WDP drive, and the overwriting of deleted data by images on the Pockey USB. On February 11, 2016, Separators filed a motion for order to show cause seeking to have the Defendants held in contempt and sanctioned for violating the discovery orders by destroying and concealing evidence relevant to its claims. Among its requests for relief, Separators sought a default judgment against the Defendants on several of its claims the prosecution of which it alleged had been materially impeded by the Defendants' actions.

[13] On March 16, April 26, and May 17, 2016, the trial court held hearings on Separators' rule to show cause motion. The Defendants did not dispute that they had copied Separators' manuals before leaving the company and had downloaded the copied data onto CSI computers for their use, but they did dispute that any data they had taken constituted trade secrets or was proprietary to Separators. Carmichael admitted that he had deleted emails from his CSI computer after the discovery orders were entered, which he acknowledged made it difficult to determine whether the emails were Separators-related. Monday testified that, immediately upon learning of the lawsuit from Carmichael and after being personally served with the Complaint himself, he became anxious and deleted files from his CSI computer. However, Monday denied having possession of the Seagate and Pockey USBs on September 14, 2015, the day that data had been deleted from those devices. Monday testified that the Seagate USB had been in the possession of his girlfriend and that the Pockey USB had been in the possession of his ex-wife, but he also related that

he did not inform his girlfriend or his ex-wife of the lawsuit until days after he was served with the Complaint. Monday further testified that he had met with his ex-wife on October 5, 2015, to download family photographs from the Pockey USB before producing it to Separators. Monday could not explain how the images were overwritten onto the Pockey USB. Neither Monday's girlfriend nor his ex-wife testified at the hearings. Green provided expert testimony regarding her forensic examination and the loss of data from the Seagate and Pockey USBs and the CSI computers.

[14]   On November 8, 2016, the trial court issued its Order finding the Defendants in contempt. The trial court ruled that the Defendants had "acted in conspiracy with one another in violating the [c]ourt's orders" by willfully deleting information from the Seagate and Pockey USBs and the CSI computers, attempting to hide the deletion of data on the Pockey USB by overwriting 3000 images onto the device, and failing to disclose the existence of the internet-based locations of relevant electronic files. (Appellant's App. Vol. II, p. 83). As a sanction for these discovery violations, the trial court entered a default judgment on Separators' claims of misappropriation of trade secrets, breach of fiduciary duty/duty of loyalty, computer trespass, theft, conversion, and civil conspiracy. In addition to entering the default judgment against the Defendants, the trial court awarded Separators attorneys' fees and costs for prosecuting its show-cause motion, and, in order to ensure that the Defendants did not violate its orders in the future, the trial court ordered that they would be subject to third-party oversight of their electronic data use for two years. The

Defendants did not seek to set aside the default judgment, and the parties continued to engage in discovery.

[15] On October 31, 2017, Carmichael filed a motion for summary judgment arguing that Separators' breach of fiduciary duty/duty of loyalty, computer trespass, conversion, theft, and civil conspiracy claims were barred by the applicable two-year statute of limitations. As part of its response, Separators argued that the entry of the default judgment precluded Carmichael's motion for summary judgment. On March 8, 2018, after a hearing, the trial court denied Carmichael's motion for summary judgment in an order addressing the merits of his arguments.

[16] On March 19 through March 22, 2018, the trial court conducted a bench trial on Separators' claims for exemplary and compensatory damages. Separators showed that, in addition to taking the manuals and other technical information that had been the subject of the discovery sanctions hearing, about two months before leaving Separators, Carmichael had created a contact list of 203 of Separators' clients on his CSI computer, which, immediately after leaving the company, he had used to target and serve Separators' customers. Carmichael had also taken requests for quotes from Separators which he had used to provide quotes for potential CSI customers. Carmichael and CSI had immediately begun using the manuals they had taken from Separators and had continued to use them in their ordinary course of business. CSI had been immediately profitable, which was highly unusual for a start-up company. By

2016, its annual net income was $1.4 million, and, as of April 2017, CSI had already generated total profits of $3.25 million for the year.

[17] To support its claims for damages, Separators presented the expert testimony of certified public accountant (CPA) Rodney Crawford (Crawford). Crawford testified regarding the methods he used to calculate Separators' lost profits and the amount lost, which he concluded was $8,680,447. Counsel for the Defendants cross-examined Crawford on these issues. CPA Daniel Gross (Gross) provided expert testimony for the Defendants. On the third day of trial, the trial court excluded evidence of any independent damages calculation done by Gross because the Defendants had not timely disclosed that opinion evidence to Separators. Gross's testimony was limited to a critique of the facts and assumptions underpinning Crawford's lost-profits calculations.

[18] The parties engaged in post-trial briefing. In its submission to the trial court, Separators argued that it was entitled to compensatory damages for lost profits on its misappropriation of trade secrets, breach of fiduciary duty/duty of loyalty, computer trespass, conversion, theft, and conspiracy claims in the amount of $8,680,447. Separators claimed exemplary treble damages pursuant to the Indiana Crime Victim's Relief Act (ICVRA), or, in the alternative, an award of exemplary doubled damages under the IUTSA.

[19] On January 31, 2019, the trial court entered its Order on damages. The trial court found that CSI could not have obtained its unusual level of success without the data it had taken from Separators and that less than three percent of

its business had come from customers who had not previously been customers of Separators. The trial court further found that CSI had received a competitive advantage through its misappropriation of Separators' data without having to incur the substantial costs and burdens Separators had. The trial court awarded Separators $8,680,447 in compensatory damages.

[20] The trial court considered Separators' request for treble exemplary damages under the ICVRA. While it found that the Defendants had wrongfully taken Separators' property and had attempted to hide that fact by destroying evidence in violation of its discovery orders, it also found that many of the manuals were publicly available, it was industry practice for employees to compile technical information and take it with them as they moved to another employer, the parts industry was heavily-reliant on relationships, and that Carmichael's relationship with some of Separators' clients had likely enticed them to go to CSI. The trial court declined to enter treble damages but found that $3,000,000 in exemplary damages was warranted. The trial court found that, if it were not awarding damages under the ICVRA, it would have awarded the double damages Separators sought under the IUTSA, concluding that the Defendants had engaged in the type of willful and malicious misappropriation required to recover under the IUTSA. Based on its findings and conclusions, the trial court entered the following Order:

> [T]he [c]ourt hereby awards [Separators] damages as set forth above consisting of compensatory damages in the amount of $8,680,447.00 and exemplary damages pursuant to the [ICVRA] in the amount of $3,000,000.00.

(Appellant's App. Vol. II, p. 112).

On March 5, 2019, Carmichael and CSI filed their Motion to Correct Error pursuant to Trial Rule 59 in which they requested, among other things, that the trial court vacate its November 8, 2016, default judgement, arguing that the trial court's finding that Carmichael and Monday had conspired to violate the trial court's discovery orders was a legal impossibility because, as agents of the same principal, CSI, they could not have been two separate entities who could have agreed to conspire. Carmichael and CSI later styled their motion as a Motion to Reconsider. On July 11, 2019, the trial court denied the Motion to Correct Error/Motion to Reconsider in an Order addressing the merits.

Carmichael now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Standard of Review*

Carmichael appeals following the trial court's entry of special findings of fact and conclusions of law pursuant to Indiana Trial Rule 52(A). Therefore, we employ a two-tiered standard of review in which we will affirm if the evidence supports the findings and the findings support the judgment. *Wysocki v. Johnson*, 18 N.E.3d 600, 603 (Ind. 2014). When conducting our review, we neither reweigh the evidence, nor do we reassess the credibility of the witnesses. *Marion Cty. Auditor v. Sawmill Creek, LLC*, 964 N.E.2d 213, 216 (Ind. 2012). We consider the evidence most favorable to the judgment, with all reasonable inferences drawn in favor of the judgment. *Stout v. Underhill*, 734 N.E.2d 717,

719 (Ind. Ct. App. 2000), *trans. denied*. We will not set aside the trial court's findings or judgment unless they are clearly erroneous. *Wysocki*, 18 N.E.3d at 603. Findings of fact are clearly erroneous only where they enjoy no factual support in the record, and a judgment is clearly erroneous if it applies an incorrect legal standard to properly-found facts. *Id.*

## II. *Default Judgment*

[24] Carmichael challenges the trial court's entry of the default judgment against him and his co-defendants, raising the same intracorporate conspiracy argument he raised in his Motion to Correct Error. Carmichael also argues that there was insufficient evidence that he had an agreement with Monday to violate the discovery orders, his individual conduct alone was inadequate to support the default judgment, and entry of the default judgment as a sanction for violating the discovery orders was an abuse of the trial court's discretion. We address each of these arguments in turn.

### A. *Intracorporate Conspiracy*

[25] Carmichael argues that the trial court's finding that he and Monday conspired to violate the discovery orders was clearly erroneous because a conspiracy requires two entities to form an agreement, and, as agents of CSI, they were but one entity. Separators responds that Carmichael's challenge to the default judgment is not properly before this court because Carmichael first challenged the default judgment via an Indiana Trial Rule 59 motion to correct error, rather than through a TR 60(B) motion to set aside the judgment. Carmichael

counters that Separators did not raise its TR 60(B) argument below and, therefore, it is waived.

[26] We agree with Carmichael. TR 55 governing default judgments provides that "[a] judgment by default which has been entered may be set aside by the court for the grounds and in accordance with the provisions of Rule 60(B)." TR 60(B) motions are used to set aside default judgments entered as a sanction for discovery violations. *See, e.g.*, *Ameristar Casino E. Chicago, LLC v. Ferrantelli*, 120 N.E.3d 1021, 1026 (Ind. Ct. App. 2019) (appeal from denial of defendant Ameristar's TR 60(B) motion to set aside default judgment entered as sanction for discovery violations), *trans. denied*; *Waterfield v. Waterfield*, 61 N.E.3d 314, 331 (Ind. Ct. App. 2016) (noting that the appeal of a default judgment sanction for discovery violations was taken after the appellant's TR 60(B) motion was denied), *trans. denied*. Be that as it may, Separators never raised this issue in the proceedings below. It is well-settled that "[i]ssues not raised at the trial court are waived on appeal." *Cavens v. Zaberdac*, 849 N.E.2d 526, 533 (Ind. 2006) (citing *Reemer v. State*, 835 N.E.2d 1005, 1007 n.4 (Ind. 2005); *Ealy v. State*, 685 N.E.2d 1047, 1050 (Ind. 1997)). We conclude that, by failing to raise its TR 60(B) argument to the trial court, Separators waived it. *See id*.

[27] It is equally well-settled, however, that issues raised for the first time in a motion to correct error are waived. *See O'Bryant v. Adams*, 123 N.E.3d 689, 694 (Ind. 2019) (finding waiver of an argument presented for the first time in a

motion to correct error where O'Bryant failed to establish the argument had not been available during the original proceedings); *Fillmore LLC v. Fillmore Mach. & Tool Co.*, 783 N.E.2d 1169, 1179 (Ind. Ct. App. 2003) (issue raised for the first time in a motion to correct error waived where opposing party had no prior notice of the issue, it not having been raised in the answer, as a counter-claim or third-party complaint, in the parties' agreed entry, or in the proposed findings of fact and conclusions of law), *trans. denied*; *Babinchak v. Town of Chesterton*, 598 N.E.2d 1099, 1103 (Ind. Ct. App. 1992) (argument not raised or considered before being raised in a motion to correct error was waived). Carmichael's intracorporate conspiracy argument was available to him at the commencement of the instant litigation, but he did not raise it in his Answer to the Complaint, in his written objection to the rule-to-show-cause motion or its supporting memorandum, during the three hearings on the show-cause motion, or in his proposed findings of fact and conclusions of law for the show-cause proceedings. Indeed, this issue was not raised until after the trial court had conducted a four-day bench trial on damages, the parties had engaged in post-trial briefing, and the trial court had entered its Order on damages. The argument Carmichael presents was not raised by the Defendants until they filed their March 5, 2019, Motion to Correct Error. We conclude that Carmichael waived this issue, and inasmuch as the trial court considered it in denying Carmichael's Motion to Correct Error, it should not have.

### B. *Agreement*

The trial court concluded that "Carmichael, Monday, and [CSI] have acted in conspiracy with one another in violating the [c]ourt's orders." (Appellant's App. Vol. II, p. 83). Carmichael asserts that the evidence did not support the trial court's determination that he and Monday conspired to violate the discovery orders because there was no evidence of an agreement between them to do so. As a general principle, "[a] civil conspiracy is a combination of two or more persons engaging in a concerted action to accomplish an unlawful purpose, or to accomplish some lawful purpose by unlawful means." *Hardy v. South Bend Sash & Door Co., Inc.*, 603 N.E.2d 895, 902 (Ind. Ct. App. 1992). The elements of an action for civil conspiracy are an object to be accomplished, a meeting of the minds on the object or course of action, one or more overt acts, and damages proximately caused by those acts. 16 Am. Jur.2d *Conspiracy* § 51. "While an agreement between the parties is a necessary element of civil conspiracy, such agreement need not extend to all the details of the conspiratorial scheme." *Id.* In addition,

> [i]t is not necessary in order to establish a conspiracy that there be direct evidence of an agreement. Rather, a civil conspiracy may be asserted through circumstantial evidence or by averment of isolated or independent facts susceptible of an inference of concurrence of sentiment.

*Miller v. Central Ind. Com. Found.*, 11 N.E.3d 944, 963 (Ind. Ct. App. 2014) (citations omitted), *trans. denied*. Because conspiracies are usually formed in secret and are consequently seldom supported at trial by direct testimony, it is

particularly necessary and proper to permit them to be inferred from circumstances. *Smith v. Fiscus*, 62 Ind. App. 156, 160, 111 N.E. 203, 204 (Ind. 1916). When multiple parties are found to have conspired to commit civil contempt, each participant in the conspiracy may be held responsible as a joint tortfeasor for damages caused by the wrongful or contemptuous acts, regardless of the degree of active participation. *Bottoms v. B&M Coal Corp.*, 405 N.E.2d 82, 90 (Ind. Ct. App. 1980).

[29] Here, the evidence supported the trials court's determination that Carmichael and Monday conspired to violate the trial court's discovery orders in order to frustrate Separators' ability to successfully prosecute its Complaint. The discovery orders contained clear directives: The Defendants were not to destroy, or render unavailable, any data relevant to Separators, and they were to produce all devices and internet-based accounts used to store data related to Separators. Carmichael and Monday had a long history of working together at Separators and admittedly removed data from Separators without Separators' express consent before leaving that company. Carmichael is the president and sole shareholder of CSI, and Monday is CSI's vice president. Carmichael and Monday subsequently uploaded the data they had taken from Separators onto their CSI computers and into internet-based data storage accounts. Carmichael was first served with the TRO, OPEE, and the Complaint that named the Defendants in a suit based on their taking Separators' data without Separators' consent. According to Carmichael, Monday was with him at Carmichael's home when Carmichael was served. Within three minutes of Carmichael being

served, 100 files were deleted from the Pockey USB. The reasonable inference to be made from these facts and circumstances was that Carmichael and Monday agreed that part of their efforts to defend the allegations contained in the Complaint would be to eliminate evidence in their possession that could prove Separators' claims. The subsequent deletions of data from the Seagate USB and the CSI computers, the concealment of the internet-based data storage accounts and the WDP device, and the overwriting of deleted data on the Pockey USB were other acts in furtherance of that agreement. In light of this evidence that Carmichael and Monday had both been named in Separators' Complaint, they were physically together when the data deletion began, the suspicious timing of the first deletion from the Pockey USB so quickly after Carmichael was served with the Complaint, and the subsequent deletions and overwriting that occurred just before discovery was to be produced, we cannot conclude that the trial court's determination that Carmichael and Monday conspired to violate the discovery orders was clearly erroneous. *See Wysocki*, 18 N.E.3d at 603.

[30] Carmichael's sole argument on this point is that a finding of a conspiracy based on an agreement between him and Monday was "counterintuitive" because Monday deleted data from the two USBs and his CSI computer and overwrote images onto the Pockey USB, whereas Carmichael "merely deleted only 20 'potentially responsive' emails" from his CSI computer. (Appellant's Br. p. 25). Carmichael essentially argues that he could not have agreed to violate the discovery orders because Monday performed more overt acts than he in

furtherance of the conspiracy. This argument is unpersuasive because it overlooks evidence that Carmichael also failed to disclose the WDP drive and because crediting his argument would entail us reweighing the evidence presented to the trial court, which is contrary to our standard of review. *See Marion Cty. Auditor*, 964 N.E.2d at 216.

## C. *Carmichael's Individual Acts*

[31] Carmichael next asserts that his individual acts of deleting his emails and failure to disclose the WDP drive could not support a finding by the trial court that he had intentionally violated the discovery orders. This argument is premised on Carmichael's contention that Monday's acts could not be attributed to him as a co-conspirator. Because we have already concluded that the trial court's determination that the Defendants conspired to violate the discovery orders was not clearly erroneous, we do not address Carmichael's contention that his individual acts alone were insufficient to support the entry of the default judgment.

## D. *Default Judgment as Sanction*

[32] Carmichael next contends that the trial court abused its discretion when it entered the default judgment against him and his co-defendants after concluding that they were in contempt of the discovery orders and had destroyed and hidden evidence. Trial courts have the inherent power to punish litigants in order to maintain the dignity of the court, secure obedience to process and rules, rebuke interference with the orderly conduct of business, and to punish unseemly behavior. *City of Gary v. Major*, 822 N.E.2d 165, 169 (Ind.

2005). As part of that inherent power, a trial court may impose sanctions to protect the discovery process. *Noble Cty. v. Rogers*, 745 N.E.2d 194, 198 (Ind. 2001). In addition, Indiana Trial Rule 37(B)(2) provides that if a party fails to obey a discovery order, a trial court "may make such orders in regard to the failure as are just," including entering a default judgment against the offending party. It is within the trial court's sound discretion to select the appropriate sanction for discovery violations, and, thus, we review the trial court's decision only for an abuse of that discretion. *Whitaker v. Becker*, 960 N.E.2d 111, 115 (Ind. 2012). "Trial judges stand much closer than an appellate court to the currents of litigation pending before them, and they have a correspondingly better sense of which sanctions will adequately protect the litigants in any given case, without going overboard, while still discouraging gamesmanship in future litigation." *Id*. In addition, "the purpose of sanctioning discovery violations is not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent." *Id.* (quotation and citation omitted).

[33] Here, the trial court determined that Carmichael and Monday had deleted evidence from the Pockey and Seagate USBs, their CSI computers, including emails, and had concealed the existence of the WDP device and the internet-based data storage accounts, thereby engaging in spoliation. *See WESCO Dist., Inc., v. ArcelorMittal Ind. Harbor LLC*, 23 N.E.3d 682, 702 (Ind. Ct. App. 2014) ("Spoliation of evidence is the intentional destruction, mutilation, alteration, or concealment of evidence."), *trans. dismissed*. Our supreme court has noted that

"[c]ourts uniformly condemn spoliation. [I]ntentional destruction of potential evidence *in order to disrupt or defeat another person's right of recovery* is highly improper and cannot be justified." *Gribben v. Wal-Mart Stores, Inc.,* 824 N.E.2d 349, 354 (Ind. 2005) (quotation omitted, emphasis added). Our supreme court has provided the following guidance on the appropriateness of sanctions for spoliation:

> Determining whether sanctions are warranted and, if so, what they should include, requires a court to consider both the spoliating party's culpability and the level of prejudice to the party seeking discovery. Culpability can range along a continuum from destruction intended to make evidence unavailable in litigation to inadvertent loss of information for reasons unrelated to the litigation. Prejudice can range along a continuum from an inability to prove claims or defenses to little or no impact on the presentation of proof. A court's response to the loss of evidence depends on both the degree of culpability and the extent of prejudice. Even if there is intentional destruction of potentially relevant evidence, if there is no prejudice to the opposing party, that influences the sanctions consequence. And even if there is an inadvertent loss of evidence but severe prejudice to the opposing party, that too will influence the appropriate response, recognizing that sanctions (as opposed to other remedial steps) require some degree of culpability.

*Howard Reg'l Health Sys. v. Gordon*, 952 N.E.2d 182, 189-90 (Ind. 2011) (quoting *Rimkus Consulting Grp., Inc. v. Cammarata*, 688 F.Supp.2d 598, 613 (S.D. Tex. 2010)). In light of this guidance, we will examine the trial court's findings and conclusions regarding the Defendants' culpability in the spoliation as well as the prejudice resulting to Separators.

### 1. *Culpability*

[34] The trial court entered the following relevant findings and conclusions regarding the Defendants' culpability in the spoliation:

> 55. The [c]ourt finds that the above-referenced deletions were an attempt by the Defendants to prevent data and other evidence from being discovered in this litigation.
>
> * * * *
>
> 87. Based on the facts found above, the [c]ourt concludes that the Defendants have engaged in contempt.
>
> * * * *
>
> 92. The Defendants have failed to meet their burden of showing that their violations of the [c]ourt's clear orders were not willful. To the contrary, the evidence shows the opposite. The Defendants deleted Separator[s'] data despite having notice [of] the very subject of the lawsuit filed against them concerned what data they had taken and what they had done with it.
>
> * * * *
>
> 96. The Defendants' actions were deliberate and willfully disregarded the explicit instructions of the [c]ourt's [discovery orders]. As such, and to prevent further irreparable harm, the Defendants will be held in contempt, and appropriate remedies and sanction will now issue.
>
> 97. The [c]ourt finds that the Defendants have engaged in the willful, bad-faith, intentional destruction of evidence.

98.  Separate from the [c]ourt's express orders, the Defendants were under an obligation to preserve potentially relevant evidence.  They did the opposite and intentionally deleted data that they knew might be used to support [Separators'] claims against them.

99.  The Defendants' actions were egregious and were intended to interfere with [Separators'] claims against the Defendants and with the orderly administration of justice by this [c]ourt.

(Appellant's App. Vol. II, pp. 73, 82-84).  The trial court found that the Defendants should not be permitted to benefit by their destruction of evidence and that fairness required that default judgment be entered against them.

[35]  The evidence showed that despite the clear directives of the trial court's discovery orders, the Defendants destroyed and concealed data relevant to Separators' claims.  The destruction was swift and continuing.  The first deletion from the Pockey USB occurred just three minutes after Carmichael was served with the Complaint, TRO, and OPEE, and over 1000 additional files were deleted from the Seagate USB shortly after Monday was served.  The subsequent spoliation occurred just before the Defendants were to produce evidence relevant to Separators' discovery requests:  Almost 1000 files were deleted from Monday's CSI computer between September 22 and September 24, 2015, the date the computer was to be turned over to Green for examination, and approximately 3000 images were overwritten onto the Pockey USB on October 5, 2015, the day before it was produced.  Carmichael deleted responsive emails from his CSI computer, and the Defendants also

failed to disclose relevant internet-based data storage accounts and the WDP device. Despite Green's expert testimony concerning the substance and timing of the deletions, Monday offered implausible denials of responsibility. For his part, Carmichael admitted that deleting emails from his CSI computer made it difficult to discern if they were Separators-related.

[36] Carmichael only challenges his culpability for these actions with the same arguments we have already found to be unpersuasive elsewhere, namely that Monday's spoliation was improperly attributed to Carmichael and that his own individual conduct was inadequate to support the entry of a default judgment. However, as a co-conspirator, Carmichael was equally liable for Monday's acts of spoliation. *See Bottoms*, 405 N.E.2d at 90. There is no other reasonable inference to be made from the substance, timing, multiplicity of these actions but that Carmichael and Monday sought to frustrate Separators' ability to prove its claims. This degree of spoliation represents the apex of the spoliation culpability continuum and has been strongly condemned by our supreme court. *See Howard Reg'l Health Sys.*, 952 N.E.2d at 189-90; *Gribben,* 824 N.E.2d at 354. While it is the regular practice of trial courts to fashion progressive sanctions leading up to a dismissal or default judgment when it is possible to do so, imposing intermediate sanctions is not obligatory when a party's behavior is particularly egregious. *See Prime Mortgage USA, Inc. v. Nichols*, 885 N.E.2d 628, 649-651 (Ind. Ct. App. 2008) (holding that the defendant's production of a forged shareholder agreement during discovery merited the sanction of a default judgment, a sanction that is most often invoked where a party commits perjury

or destroys or doctors evidence); *Whitaker*, 960 N.E.2d at 116-17 (upholding the entry of default judgment as sanction for car accident plaintiff's late and misleading discovery response that he had no planned treatment for his spine when, in fact, surgery had been planned that would obscure the source of his claimed injuries); *Whitewater Valley Canoe Rental, Inc. v. Bd. of Franklin Cty. Comm'rs*, 507 N.E.2d 1001, 1007-08 (Ind. Ct. App. 1987) (holding that entry of default judgment against Whitewater was proper where trial court found that it had either destroyed or failed to produce documents which it had earlier claimed were too burdensome to produce and had motioned to protect).

[37] We agree with the trial court that Carmichael's and Monday's conduct was egregious and demonstrated a flagrant disregard for the trial court's discovery orders and the judicial process. This is precisely the type of discovery misconduct that should be sanctioned by default so as to discourage other litigants from attempting it. *See Whitaker*, 960 N.E.2d at 115. Accordingly, we find no clear error in the trial court's findings and conclusions, and we further conclude that it was within the trial court's discretion to enter a default judgment given the high degree of Carmichael's shared culpability.

## 2. *Prejudice*

[38] The trial court's findings regarding prejudice to Separators concentrated on the data deletions, as opposed to the concealment of the WDP drive and the internet-based data storage accounts, and so we will focus our analysis there as well. The trial court entered findings of fact generally consistent with Green's trial testimony. The trial court found that the overwriting of the 3000 image

files onto the Pockey USB likely made relevant data forever irretrievable. The 932 files that were deleted from Monday's CSI computer were not recoverable beyond the names of the files. Although Green was able to recover the names of many files that had been deleted from the USBs and the CSI computers, much relevant evidence had been destroyed, including additional filenames, the contents of the files, and metadata showing how the files that been used, transferred, or copied. There may have been additional files relevant to Separators that had been totally deleted such that Green could not recover the filenames or even determine how many had been deleted. The trial court quoted one of Green's reports and found that the spoliation had "'certainly destroyed relevant evidence.'" (Appellant's App. Vol. II, p. 72).

[39] The trial court entered the additional following relevant findings and conclusions regarding the prejudice resulting to Separators as a result of the spoliation:

> 51. The acts of deleting data from the Pockey USB device, the Seagate USB device, and the [CSI] computers have destroyed evidence potentially relevant in this litigation and hindered the forensic investigation. These actions added layers of complexity that have increased the amount of time and reconstruction efforts required of Green in conducting her forensic investigation. . . .
>
> * * * *
>
> 53. The deletion of evidence described above obstructs Green's ability to conduct a complete analysis of the electronic storage devices to identify all of the Separators [] data that the Defendants copied and to determine how the Defendants used

that data. That deletion therefore interferes with [Separators']
ability to discover those facts and use them to support its claims
against the Defendants and interferes with the [c]ourt's ability to
decide these issues.

* * * *

100. The Defendants' deletions risk causing substantial prejudice
to Separators [] in prosecuting its claims.

* * * *

102. The Defendants' deletions and anti-forensic activity have
resulted in some data being irretrievably lost.

103. The Defendants' deletion of data thus impairs Separators []
ability to go to trial on the following claims: [misappropriation
of trade secrets, computer trespass, theft, conversion, and breach
of fiduciary duty/duty of loyalty].

104. The existing evidence shows that the Defendants copied
hundreds or thousands of Separators [] computer files onto [the
Pockey and Seagate USBs] and transferred them to [CSI's]
computers. To determine the Defendants' liability and damages
for computer trespass, misappropriation, theft, conversion, and
breach of their fiduciary duty and duty of loyalty, this [c]ourt
must know *what* computer files that the Defendants improperly
copied and *what* Defendants did with these computer files.

105. Indeed, the Defendants have already made clear that they
intend to defend this lawsuit in part by disputing exactly which
type of files they took. For example, the Defendants have argued
in their briefing and at the hearings that they took only [the]

> manuals from Separators [] and they dispute whether such manuals may be treated as Separators['] property.
>
> 106. However, the Defendants' deletion of many of the electronic files, including the deletion of metadata and the deletion of some files irretrievably and completely, deprives this [c]ourt of evidence showing all of the files that the Defendants copied and of evidence showing when and how the Defendants used those files in operating their new competing business.

(Appellant's App. Vol. II, pp. 71-72, 84-87) (record citations and footnote omitted, emphasis in the original).

[40] In assessing whether prejudice resulting from discovery violations merits the entry of a default judgment, we consider how the violation impacted the non-violating party's ability to bring or defend claims. *Howard Reg'l Health Sys.*, 952 N.E.2d at 189-90. In *Whitaker*, 960 N.E.2d at 114, 117, our supreme court upheld the trial court's determination that default was merited where Whitaker's obfuscation during discovery about having cervical spine fusion surgery impacted the only real issue in the case, namely whether his surgery was prompted by the collision at the base of the lawsuit or by a pre-existing condition. Similarly, in *Prime Mortgage*, 885 N.E.2d at 651, we upheld a trial court's entry of default judgment against the defendant for submitting a forged shareholder agreement during discovery because that forgery went to the heart of the shareholders' dispute and caused the plaintiff-shareholder to change her theory of the case. Entry of a default judgment has also been found to be warranted where discovery violations resulted in difficulty to the opposing party

in preparing for trial and additional expense. *See Sahara Mart, Inc. v. Ind. Dep't Revenue*, 114 N.E.3d 36, 50 (Ind. Tax Ct. 2018) (concluding that defendant-taxpayer's perjury and witness-tampering in a sales-tax proceeding impeded trial preparation and caused the Department to expend time and money gathering and presenting evidence to support its rule-to-show-cause motion).

[41] Here, Carmichael and Monday admitted that they had taken data from Separators, but they claimed that they had only taken the manuals which they contended were not trade secrets or proprietary to Separators. Separators disputed that Carmichael and Monday took only the manuals. It alleged in its Complaint that the Defendants had taken other materials such as "parts lists, customer lists, supplier information, custom parts drawings, manuals, and financial reports[,]" and thus had "accessed, copied and used a significant portion of Separators' technical, commercial, and financial library." (Appellant's App. Vol. III, pp. 40, 42). In order to prosecute these claims, it was essential for Separators to know the totality of the data taken and how it had been used by the Defendants. Therefore, the trial court's conclusion that the partial and complete deletions of data from the USBs and CSI computers interfered both with Separators' ability to proceed on its claims and with the trial court's ability to decide the case was not clearly erroneous. In addition, as in *Sahara Mart*, the spoliation necessitated a forensic investigation by Green, added layers of complexity to her investigation, and resulted in show-cause proceedings, causing Separators delay and additional litigation expenses.

Regarding the issue of prejudice, Carmichael merely argues that any prejudice flowing to Separators was caused by Monday's actions which could not be imputed to him and that his individual conduct caused no prejudice, arguments we find to be unpersuasive because of the trial court's finding that he conspired with Monday. Carmichael also quotes *Nagel v. Northern Indiana Public Service Company*, 26 N.E.3d 30, 39 (Ind. Ct. App. 2015), *trans. denied*, for the proposition that "[i]n determining the appropriateness of default judgment as a [] sanction, there is a marked preference in Indiana for deciding disputes on their merits, especially in cases involving material issues of fact, substantial amounts of money, or weighty policy determinations." (Appellant's Br. p. 50-51). In support of this argument, Carmichael identifies what he contends were issues of material fact concerning his defense that the manuals were not trade secrets or proprietary to Separators. What this argument overlooks is that the Defendants' own acts of spoliation rendered the material issues of fact pertaining to Separators' claims—what data the Defendants took and how they used it—incapable of being fully known, and therefore, resolved. We acknowledge that a substantial amount of money is involved in this case, in excess of $11,000,000. However, *Prime Mortgage* illustrates that this court will uphold the entry of default judgment as a sanction for discovery violations in cases which involve substantial sums of money where the conduct at issue was egregious and material prejudice has been shown. 885 N.E.2d at 672 (upholding default judgment entered as a sanction and damages award in excess of $8,000,000). Carmichael does not identify any weighty policy

determinations for us that would render the default judgment entered in this case inappropriate.

[43] We recognize that Carmichael and Monday were not completely successful in their spoliation efforts and that Separators was still able to gather some evidence that large numbers of its manuals as well as some other types of documents had been taken. Thus, Separators was not entirely precluded from pursuing its claims. The trial court assessed the degree of prejudice to Separators, and, together with its findings and conclusions regarding the Defendants' culpability, determined that the default judgment was warranted. This court has observed that "the culpability versus prejudice balancing act, namely, the prejudice to the non-spoliating party versus the culpability of the spoliating party, is best left to the trial court." *Northern Ind. Pub. Serv. Co. v. Aqua Envtl. Container Corp.*, 102 N.E.3d 290, 304 (Ind. Ct. App. 2018). The trial court entered findings and conclusions which were supported by the evidence and which in turn supported its determination that a default judgment was merited based on the Defendants' culpability and the prejudice resulting from their actions. Therefore, we conclude that its determination was not clearly erroneous. *See Wysocki*, 18 N.E.3d at 603.

### III. *Summary Judgment*

[44] Carmichael next contends that the trial court erred when it denied his October 31, 2017, motion for summary judgment on Separators' fiduciary duty/duty of loyalty, computer trespass, conversion, theft, and civil conspiracy claims in which he argued that those claims were barred by the applicable two-year

statute of limitations. Carmichael did not move for summary judgment on any claims that were not already subject to the default judgment. Separators responds that Carmichael improperly moved for summary judgment after the trial court had entered the default judgment. Therefore, as a threshold issue, we must determine whether Carmichael's argument is properly before us.

[45] On March 8, 2018, after a hearing, the trial court denied Carmichael's summary judgment motion in an order addressing the merits of his statute of limitations arguments. In a footnote the trial court observed the following:

> The parties disagree about whether Carmichael is entitled to move for summary judgment at this stage of the proceedings, in light of the default judgment entered against him on some of Separators['] claims. For purposes of this Order, the [c]ourt assumes without deciding that Carmichael's motion is timely, as his motion fails on the merits. However, language in *Prime Mortgage*, 885 N.E.2d at 639 seems to suggest otherwise.

(Appellant's App. Vol. X, p. 144).

[46] On appeal, Carmichael joins the trial court's suggestion that this court's decision in *Prime Mortgage* provides authority for a litigant to pursue summary judgment proceedings on claims subject to a default judgment entered as a sanction for discovery violations. We disagree, given the circumstances of this case. In *Prime Mortgage*, plaintiff Nichols, who held a fifty per cent interest in Prime, filed an action for the appointment of a receiver and the dissolution of the closely-held corporation when she and the only other shareholder, Law, were unable to agree on a buyout for Nichols. 885 N.E.2d at 637. Law

responded that Nichols did not have a fifty per cent interest in Prime, as he had issued stock to two other persons pursuant to an agreement he claimed Nichols had signed which authorized the stock issue. *Id*. Nichols amended her Complaint to add a claim of breach of fiduciary duty against Law for allegedly improperly inducing her to sign the agreement. *Id*. However, Nichols subsequently determined through discovery that Law had forged her signature on the agreement, causing her to file a third amended Complaint alleging the forgery and seeking treble damages against Law and his co-defendant Prime pursuant to the ICVRA. *Id*. at 637-38. The defendants moved for summary judgment, arguing that the Crime Victims Statute count was barred by the statute of limitations. *Id*. at 638. The trial court denied that motion. *Id*. Nichols then sought sanctions against the defendants for Law's submission of the forged agreement during discovery. *Id*. The trial court granted Nichols' sanctions motion, dismissed the defendants' counterclaims and granted summary judgment on some, but not all, of Nichols's claims. *Id*. The trial court later entered treble damages in favor of Nichols in excess of $8,000,000. *Id*.

[47] On appeal, the *Prime Mortgage* court considered whether the defendants were able to appeal the denial of their motion for summary judgment after the trial court had entered a default judgment against them as a sanction for their discovery conduct. *Id*. at 638-39. The *Prime Mortgage* court concluded that it was possible because the trial court had not stricken the defendants' answers and affirmative defenses upon entering the default judgment. *Id*. at 639. The

court also found it significant that the entire summary judgment proceedings were concluded before the trial court's entry of the default judgment. *Id*. The court, therefore, addressed the merits of the statute of limitations argument. *Id*.

[48] *Prime Mortgage* is distinguishable on its facts from the instant case. Here, although the trial court did not strike his answer and affirmative defenses in conjunction with the default judgment, Carmichael did not file his summary judgment motion until after the trial court had entered its default judgment sanction, and, thus, the significant procedural rationale set out in *Prime Mortgage* is not present here. More importantly, we believe that the nature of a default judgment entered as a sanction for discovery violations, as opposed to a default judgment entered for other reasons such as a failure to appear and answer a complaint, precludes subsequent procedural attacks such as the one mounted by Carmichael in this case. The trial court was authorized by TR 37(B)(2) to enter default judgment as a sanction for violations of its discovery orders. We find nothing in TR 37 or indeed in any other Indiana Trial Rule which would permit a defendant to challenge a discovery violation sanction through a motion alleging a procedural defense to the underlying claims of the complaint. Thus, it is of no moment that Separators still had three active claims, which it subsequently dismissed, and the trial court had not yet entered final judgment when Carmichael filed his summary judgment motion.

[49] Trial courts are permitted to exercise their contempt powers to promote orderly discovery and punish discovery violations so that others are not tempted to engage in like conduct. *See City of Gary*, 882 N.E.2d at 169; *Whitaker*, 960

N.E.2d at 115. To allow such a procedural attack on a trial court's sanction would be to seriously undermine the ability of trial courts to exercise their contempt powers to further those ends. In reaching our conclusion, we express no opinion on the availability of summary judgment proceedings following the entry of default judgment for other reasons. Because we conclude that Carmichael's summary judgment arguments are not properly before us, we do not address them further.

## IV. *Damages*

[50] Carmichael challenges the trial court's award of exemplary and compensatory damages. The computation of damages is a matter within the sound discretion of the trial court. *Fischer v. Heymann*, 12 N.E.3d 867, 870 (Ind. 2014). Where the trial court has entered special findings pursuant to TR 52(A) and the issue on review relates to the award of damages, the award should not be reversed if it is within the scope of the evidence before the trial court. *Int'l Bus. Machs. Corp. v. State on behalf of Ind. Family & Soc. Servs. Admin.*, 124 N.E.3d 1187, 1189-90 (Ind. 2019).

### A. *Exemplary Damages*

[51] Carmichael argues that the trial court improperly awarded exemplary damages under the IUTSA because the trial court's findings that he and his co-defendants acted willfully and maliciously, as required for exemplary damages under the IUTSA, were unsupported by evidence in the record. However, the factual premise of Carmichael's argument is inaccurate. The trial court awarded exemplary damages under the ICVRA, not the IUTSA. The trial

court entered findings indicating that if it were not awarding damages under the ICVRA, Separators would be entitled to damages under the IUTSA due to the Defendants' willful and malicious conduct, but its Order entering "exemplary damages pursuant to the [ICVRA] in the amount of $3,000,000.00" is clear and explicit regarding the grounds for the exemplary damages award. (Appellant's App. Vol. II, p. 112). Carmichael does not challenge any of the findings and conclusions supporting the trial court's award of damages under the ICVRA. Therefore, we do not address Carmichael's argument on this issue further.

### B.  *Compensatory Damages*

[52]   The trial court entered compensatory damages for Separators' lost profits on its misappropriation of trade secrets, breach of fiduciary duty/duty of loyalty, computer trespass, conversion, theft, and civil conspiracy claims.  The trial court entered the following relevant conclusions regarding compensatory damages:

> 4.  As a general rule, "[t]ort damages do not require absolute certainty" and lost profits need not "be ascertainable with absolute certainty."  *Columbus Medical Services Organization, LLC v. Liberty Health Care Corp.*, 911 N.E.2d 85, 96 (Ind. Ct. App. 2009). The Indiana Court of Appeals "will affirm a damage award for lost profits as long as there [is] some evidence on which to base an award for [the] anticipated profits."  *Id.* at 97 (internal quotations omitted).

> * * * *

19. Separators supported its calculation of its lost profits with the opinion and testimony of an expert witness, [] Crawford, a [CPA].

20. To prepare his lost profit calculations, Crawford analyzed both Separators' and CSI's respective financial information and the trend in Separators' parts sales before and after Carmichael began operating CSI in March 2013. He also identified overlapping customers between the two companies. Crawford determined how much of Separators' lost sales overlapped with CSI's gained sales by confirming they involved the same customers. Crawford determined that substantially all of the sales gained by CSI were with prior-Separators customers – in the years 2013-2017 over 90% of CSI's parts sales were directly to customers that were prior or current Separators customers.

21. To calculate Separators' lost profits, Crawford started by determining Separators' lost sales.

22. Crawford calculated Separators' average annual sales to each customer that it lost to CSI during the period before the customer switched to CSI. Crawford determined that Separators' historical growth trend was 5.87% based on Separators' parts sales between 2006 and 2012.

23. Crawford applied that rate to Separators' average parts sales for each of the overlapping customers to calculate what Separators' expected sales to those customers would have been from 2013 on. Crawford then subtracted the amount of Separators' actual sales to the "overlapping" customers from the amount of its expected sales to those customers to determine the amount of Separators' lost sales to those customers.

24. Following identification of Separators' lost sales, Crawford applied a profit margin to them. Crawford then determined the

appropriate damages period, selecting a period that starts at the date of the wrongful act and continues until operations return to normal. In Crawford's view, Separators' operations had still not returned to "normal" as of the date of trial because its parts sales in 2016 were only $3.1 million, whereas in 2012, before Defendants' misconduct, they were $5.1 million. Crawford therefore calculated damages through the most recent date for which he had financial data.

25. Crawford then calculated Separators' lost profits by multiplying the lost sales to the overlapping customers by the relevant profit margin.

26. Based on these figures, Crawford determined that Separators suffered lost profits in the amount of $6,804,693.00 through April 2017, with the calculation through trial putting the figure at $8,680,447.00.

27. The Court finds this methodology sound and Crawford's testimony to be credible.

(Appellant's App. Vol. II, pp. 101, 104-05). Crawford testified to the facts and calculations that were summarized in the trial court's conclusions. In light of this evidence which supported the trial court's conclusions, none of which Carmichael specifically challenges on appeal, we cannot say that the trial court's determination of Separators' compensatory damages for lost profits is clearly erroneous. *See Int'l Bus. Machs. Corp.*, 124 N.E.3d at 1189-90.

[53] Despite the evidence supporting the trial court's findings and conclusions, Carmichael argues that the trial court awarded damages "without allowing Carmichael a full opportunity to present evidence of Separators' own causation

of its lost profits that it sought to recover as damages." (Appellant's Br. p. 62). Carmichael does not further explain how he was impeded in his effort to present evidence of Separators' own culpability in its lost profits. We note that Carmichael and his co-defendants did not elect to have Gross prepare an independent damages calculation in time for presentation at trial, Gross offered expert testimony on behalf of the Defendants, and the Defendants cross-examined Crawford and Separators' other witnesses pursuant to their theory of the case and damages. Accordingly, we find no merit in this argument.

[54] Carmichael also argues that "the trial court's finding essentially concludes that CSI's success was based solely on its use of the [m]anuals, despite ample undisputed evidence to the contrary." (Appellant's Br. p. 62). In support of this contention, he directs our attention to evidence in the record that he feels demonstrated that not all of CSI's success was attributed to its use of the manuals taken from Separators, such as his pre-existing business relationships with Separators clients, CSI's lower overhead and prices, and the fact that he had no agreement-not-to-compete with Separators. Carmichael contends these factors should have resulted in some unspecified reduction in Separators' claim for damages. We find these arguments unpersuasive for at least two reasons. Carmichael mischaracterizes the trial court's findings and conclusions, in that it did not find that CSI's success was based solely on its use of the manuals. Rather, it merely found that CSI "could not have obtained the success it did without the data that was misappropriated from Separators" which included not only the manuals but also a client contact list, requests for quotes, and other

information. (Appellant's App. Vol. II, p. 99). In addition, Carmichael's arguments are unavailing because they entail our consideration of evidence that does not support the trial court's findings and conclusions, and are, therefore, contrary to our standard of review. *See Stout*, 734 N.E.2d at 719.

[55] Lastly, Carmichael challenges Crawford's methodology and the factual bases for his damages calculations. Carmichael argues that Crawford's method was flawed because he erroneously assumed that all of Separators' clients lost to CSI would do business with Separators on a yearly basis, all of Separators' lost clients did business with CSI because CSI used Separators' data, and Separators' financial losses were exclusively the result of CSI's illegitimate competition. Carmichael also contends that Crawford failed to consider a variety of factors in his computations, including Separators' high employee turn-over, Separators' decline in sales before CSI began competing, CSI's better pricing that lured Separators' customers, the importance of Carmichael's established business relationships and expertise, and the fact that Carmichael had no agreement-not-to-compete with Separators.

[56] In *Bowden v. Agnew*, 2 N.E.3d 743, 749-50 (Ind. Ct. App. 2014), this court affirmed the award of compensatory damages where the defendants, the Bowdens, challenged the basis for plaintiff Agnew's expert's calculation of profits for purposes of a compensatory damages award. Agnew and the Bowdens had entered into a business venture wherein they agreed to split their net profits equally. *Id*. at 745. In order to cover expenses in another, unrelated business venture, without Agnew's consent, the Bowdens assigned all of the

profits from their venture with Agnew to a third party. *Id*. at 746. At trial on Agnew's claims for, among other things, breach of fiduciary duty and civil conspiracy, Agnew presented the expert testimony of a CPA to support his claim to his share of the improperly-assigned profits totaling $1,754,278. *Id*. at 747. The Bowdens did not offer any expert testimony but had a spreadsheet admitted into evidence that showed that the venture had actually resulted in a net loss. *Id*. The trial court fully credited the testimony and damages calculations of Agnew's CPA and awarded Agnew $1,754,278 in compensatory damages. *Id*. On appeal, the Bowdens challenged the trial court's damages award, arguing that the CPA had not requisitioned information from the Bowdens and had excluded entire categories and time periods of expenses from his profitability calculations. *Id*. at 749. After rejecting the Bowden's argument that the CPA's opinion had an insufficient factual basis, the Court found that the Bowdens were essentially challenging the weight that the trial court should have afforded the CPA's testimony. *Id*. at 750. The Court observed that

> [the CPA] was thoroughly cross-examined at trial and steadfastly stood by his calculations. Aware of the challenges asserted by the Bowdens, the trial court expressly found [the CPA's] testimony credible, explained in detail its reliance on the expert's calculations, and concluded in part:
>
>> 66. No particular degree of certainty is required in awarding damages so long as the amount awarded is supported by the evidence and not based merely on

speculation or conjecture. *JKL Components Corp. v. Insul-Reps, Inc.*, 596 N.E.2d 945, 954 (Ind. Ct. App. 1992).

> 67. Plaintiffs have readily met this burden of proof. [The CPA] provided the Court with a detailed report and testimony regarding Agnew's measure of damages. [The CPA's] measure of damages was supported by the evidence and is neither speculative nor based upon conjecture.

The Bowdens, who have not directly challenged any of the trial court's specific findings or conclusions, have failed to establish that the trial court's reliance on [the CPA's] expert testimony regarding damages was clearly erroneous.

*Id*.

[57] Like the defendants in *Bowden*, Carmichael's challenges essentially assail the weight that the trial court accorded to Crawford's expert testimony. However, Carmichael and his co-defendants thoroughly cross-examined Crawford at trial regarding his calculations, and they presented all of these same challenges to the trial court through Gross's expert testimony. Here, as in *Bowden*, the trial court noted that Indiana law did not require absolute certainty in damages calculations, it specifically found Crawford's testimony to be credible, and it cited Crawford's methods and conclusions in reaching its damages determination. Accordingly, we find that Carmichael has failed to establish that the trial court's findings and conclusions supporting its award of compensatory damages based on Crawford's calculations were clearly erroneous. *See id*.

# CONCLUSION

[58] Based on the foregoing, we conclude that the trial court's findings and conclusions supporting the entry of a default judgment against Carmichael as a sanction were not clearly erroneous and that Carmichael's summary judgment arguments are not properly before us. We also conclude that the trial court's awards of exemplary and compensatory damages in favor of Separators were supported by the evidence and were not clearly erroneous.

[59] Affirmed.

[60] Mathias, J. and Tavitas, J. concur